[No. A121539. First Dist., Div. Four. June 30, 2009.]

ANTHONY BENINATI, Plaintiff and Appellant, v.
BLACK ROCK CITY, LLC, Defendant and Respondent.

**COUNSEL**

The Law Offices of Ian Herzog, Evan D. Marshall and Thomas F. Yuhas for Plaintiff and Appellant.

Murphy, Pearson, Bradley & Feeney, William S. Kronenberg and Steven A. Kronenberg for Defendant and Respondent.

OPINION

RUVOLO, P. J.—

I.

INTRODUCTION

Appellant Anthony Beninati (Beninati) was a three-time attendee at the iconic Burning Man festival (Burning Man), held annually at Black Rock City, Nevada. During his attendance at the 2005 festival, Beninati was himself burned when he tripped and fell into the remnants of the Burning Man effigy while participating in the festival's commemorative ritual. He sued Burning Man's promoter, respondent Black Rock City, LLC (Black Rock), seeking recovery for his personal injuries and property damage. The trial court granted summary judgment as to Beninati's single cause of action for negligence, concluding that Black Rock owed Beninati no duty of care under the doctrine of primary assumption of risk. We agree, and affirm.

II.

PROCEDURAL AND FACTUAL BACKGROUND

A.   General Procedural Background

Beninati filed a civil complaint in the San Francisco County Superior Court in August 2006. The complaint alleged that Black Rock[1] was either the lessee or possessor of land upon which the Burning Man festival was held in 2005, or that it "possessed, managed, maintained, operated, supervised, coordinated, and controlled the event," which included the burning of a 60-foot-tall wood sculpture in the figure of a man during the penultimate night of the festival. It was further alleged that immediately following the toppling of the burning sculpture, festival attendees were "authorized and invited to approach the flames to deposit tokens, mementos and other combustible objects into the fire so attendees can participate more fully and completely in the Burning Man experience." As to the single cause of action alleging negligence, the complaint averred that Black Rock negligently allowed attendees to approach the burning remnants of the Burning Man sculpture without provision for safe ingress and egress "routes and corridors" for those attendees who were "moved by the event to directly participate in the burning ritual."

---

[1] Although a number of individuals were named as defendants in addition to Black Rock, it appears that only Black Rock, the promoter organization, was served and appeared in the case below.

Black Rock filed an answer pleading six affirmative defenses including express and implied assumption of risk. Thereafter, Black Rock filed a motion for summary judgment on the basis that Beninati assumed the risk of injury by approaching the fire when the risk of getting burned was an obvious, avoidable, and inherent risk, and that Black Rock had no legal duty to minimize said risk. Following a hearing held on January 11, 2008, the court granted the motion. In its March 6, 2008 order, the court concluded, inter alia, that Black Rock owed no duty of care to Beninati under the primary assumption of risk doctrine. This timely appeal followed.

## B.  The Facts As Disclosed on Motion for Summary Judgment

The undisputed facts presented in support of, and in opposition to, the motion for summary judgment included the following:

The Burning Man festival is an annual weeklong event held at a remote desert location at Black Rock City, Nevada. There are no permanent structures at the location, nor does Black Rock City have police or health care services. If needed, emergency medical assistance is on site to assist festival-goers. While a number of large structures erected for the festival are burned, the culmination of the festival is the burning of a 60-foot-tall wood sculpture in the figure of a man, from which the festival name is derived. The Burning Man blaze occurs in front of a crowd of thousands of people. Once ignited, the wood sculpture burns until it topples and then continues to burn in a gigantic bonfire. Persons who attend Burning Man throw objects into the fire "so attendees can participate more fully and completely with [sic] the Burning Man experience."

Beninati attended the festival in the years 2002, 2003, and 2005. He is college educated and worked full time as a general manager for a company that rehabilitated real property for resale. He chose to attend the festival to get away from his "workaholic" life, and to come together with a community of people with interests in art, alternative healing, and spirituality.

Beninati was to attend the 2005 festival with a friend. However, six weeks before the festival's commencement, the friend died in a motorcycle accident. Therefore, Beninati went to the festival with a photograph of his deceased friend, intending to place the photograph in the Burning Man bonfire.

The Burning Man sculpture was ignited near sundown on September 3, 2005. When Beninati arrived at the bonfire site, the sculpture had already been ignited and had fallen. The flames upon his arrival were about 40 feet high. Beninati walked around the perimeter of the fire three times over a 90-minute period. Each time he circled a little closer to the fire.

He testified at his deposition that he did not need to be told "fire was dangerous and caused burns." Ever since his first visit to Burning Man, Beninati knew that being in close proximity to the event's huge bonfire posed a risk of receiving a burn. He also understood that he could fall or be pushed into the fire by other participants at the festival. In each of the prior years Beninati attended, he watched the Burning Man fire burn for three or four hours. Nevertheless, Beninati did not think it was dangerous to walk seven to 10 feet into the fire to burn his friend's photograph, although he knew doing so "was not 'absolutely safe, because there [was] a fire present.' "

As the fire died down somewhat, a number of people approached and threw things into it. Beninati then saw someone walk toward the burning embers and he decided to follow the person's path, walking about seven steps toward the smoldering fire. No one asked or beckoned him to approach the fire. No one affiliated with Black Rock told him it was safe to walk into the fire. Beninati was sober, and thought it was safe when he walked into an area of low flames as he saw others do.

Beninati stopped at a spot where there was fire on either side of him. He threw his friend's photograph on the fire and watched it burn. He then took a few more steps forward. His right foot "caught on something or [he] tripped on something," which may have been a cable or something solid. He tripped and fell into the fire twice, badly burning both of his hands. When he exited the fire area, people poured water on him. Paramedics, who were present at the festival around the clock, transported him to obtain medical treatment.

## III.

## LEGAL ANALYSIS

### A. Standard of Review

To assess the correctness of a trial court's grant of summary judgment, we apply familiar principles of appellate review. "[I]n moving for summary judgment, a 'defendant . . . has met' his [or her] 'burden of showing that a cause of action has no merit if' he [or she] 'has shown that one or more

elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto.' " (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

In resisting a defense motion for summary judgment, " '[t]he plaintiff . . . may not rely upon the mere allegations or denials' of his [or her] 'pleadings to show that a triable issue of material fact exists but, instead,' must 'set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto.' . . ." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 849.) "It is also well established that a litigant may not avoid summary judgment by attempting to generate disputes of fact as to issues which are not material to the legal theories and claims in issue: 'The presence of a factual dispute will not defeat a motion for summary judgment unless the fact in issue is a material one.' [Citation.]" (*Banks v. Dominican College* (1995) 35 Cal.App.4th 1545, 1551 [42 Cal.Rptr.2d 110].)

"When a defendant moves for summary judgment on the basis of implied assumption of the risk, he or she has the burden of establishing the plaintiff's primary assumption of the risk by demonstrating that the defendant owed no legal duty to the plaintiff to prevent the harm of which the plaintiff complains. [Citation.]" (*Freeman v. Hale* (1994) 30 Cal.App.4th 1388, 1395 [36 Cal.Rptr.2d 418].) Determining whether the primary assumption of risk doctrine applies is a legal question to be decided by the court. (*Knight v. Jewett* (1992) 3 Cal.4th 296, 313 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*); *Record v. Reason* (1999) 73 Cal.App.4th 472, 479 [86 Cal.Rptr.2d 547].)

## B. Law Relating to Primary Assumption of Risk Doctrine

■ The sole issue in this appeal is whether the trial court properly applied the doctrine of primary assumption of risk, "where, by virtue of the nature of the activity and the parties' relationship to the activity, the defendant owes no legal duty to protect the plaintiff from the particular risk of harm that caused the injury . . . ." (*Knight, supra,* 3 Cal.4th at pp. 314–315.) Beninati claims the trial court erred in applying primary assumption of risk to bar his negligence action because there is "essentially no case authority for extending primary assumption of the risk to 'low-impact' cultural activities of the sort found herein." In rebuttal, Black Rock

counters that Beninati primarily assumed the risk because "[i]f he had simply stayed a safe distance away from the Burning Man conflagration instead of entering its perimeter, he never would have burned himself. Accordingly, [Beninati] assumed the risk of injury, however unfortunate that injury may be."

In setting forth their respective positions on appeal, both parties rely on *Knight, supra,* 3 Cal.4th 296, the seminal case concerning the doctrine of assumption of risk. In *Knight,* the plaintiff was injured at a Super Bowl party while playing touch football with other party guests during the halftime intermission of the 1987 Super Bowl football game. The plaintiff sued a coparticipant for negligence and assault and battery to recover damages for her personal injuries. (*Id.* at p. 301.) A plurality of the court ruled that the plaintiff, as a voluntary participant in a touch football game, was barred by the doctrine of primary assumption of risk from recovering for injuries she sustained while engaging in this activity. (*Id.* at pp. 320–321.)

Then Associate Justice George began the plurality opinion in *Knight* by tracing the historic roots of the doctrine, a subject important to our analysis. The court began by noting that some confusion in the case law had developed before comparative fault was introduced by *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226], which resulted in courts failing to maintain the legal distinctions between different categories of assumption of risk. The *Li* decision contemplated that the assumption of risk doctrine would be partially merged into the comparative negligence scheme. (*Knight, supra,* 3 Cal.4th at p. 306.)

The *Knight* court explained that "the distinction [in assumption of risk cases] to which the *Li* court referred was between (1) those instances in which the assumption of risk doctrine embodies a legal conclusion that there is 'no duty' on the part of the defendant to protect the plaintiff from a particular risk—the category of assumption of risk that the legal commentators generally refer to as 'primary assumption of risk'—and (2) those instances in which the defendant does owe a duty of care to the plaintiff but the plaintiff knowingly encounters a risk of injury caused by the defendant's breach of that duty—what most commentators have termed 'secondary assumption of risk.' " (*Knight, supra,* 3 Cal.4th at p. 308, fn. omitted.)

In cases covered by primary assumption of risk, the plaintiff's recovery is "completely barred" because the "defendant's conduct did not breach a legal duty of care to the plaintiff . . . ." (*Knight, supra,* 3 Cal.4th at p. 308.) "In cases involving 'secondary assumption of risk'—where the defendant does

owe a duty of care to the plaintiff, but the plaintiff proceeds to encounter a known risk imposed by the defendant's breach of duty—the doctrine is merged into the comparative fault scheme, and the trier of fact, in apportioning the loss resulting from the injury, may consider the relative responsibility of the parties." (*Id.* at p. 315.)

■ On appeal, Beninati argues that the primary assumption of risk doctrine does not apply to Burning Man, because its application heretofore has been limited to "rule-based" sports or, at a minimum, to "active sports." Although *Knight* involved injuries occurring during a game of touch football, it is clear from the opinion that the doctrine applies not only to sports, but to other activities involving an inherent risk of injury to voluntary participants like Beninati, where the risk cannot be eliminated without altering the fundamental nature of the activity. (*Knight, supra,* 3 Cal.4th at pp. 314–316.) "[T]he question whether the defendant owed a legal duty to protect the plaintiff from a particular risk of harm does not turn on the reasonableness or unreasonableness of the plaintiff's conduct, but rather on the nature of the *activity or sport* in which the defendant is engaged and the relationship of the defendant and the plaintiff to that *activity or sport.*" (*Id.* at p. 309, italics added.)

The court explained in a footnote that the primary assumption of risk doctrine applies, "[i]n addition to the sports setting" to cases "often described as involving the 'firefighter's rule,' " which provides that one who sets a fire owes no duty of care to a firefighter injured while engaged in fire suppression activities. (*Knight, supra,* 3 Cal.4th at p. 309, fn. 5.) "Although a number of theories have been cited to support this conclusion, the most persuasive explanation is that the party who negligently started the fire had no legal duty to protect the firefighter from the very danger that the firefighter is employed to confront. [Citations.] Because the defendant in such a case owes no duty to protect the firefighter from such risks, the firefighter has no cause of action even if the risk created by the fire was so great that a trier of fact could find it was unreasonable for the firefighter to choose to encounter the risk." (*Id.* at p. 310, fn. 5.)

■ While Beninati was not a firefighter, he deliberately, and with awareness of specific risks inherent in the activity, nonetheless chose to engage in an activity similar to that engaged in by a firefighter as part of the firefighter's professional duties. The risk of injury to those who voluntarily decide to partake in the commemorative ritual at Burning Man is self-evident. As in previous years, the festival participants had set ablaze a 60-foot-tall combustible sculpture of a man which, because of its gigantic size, was built on an

equally large platform made of combustible material and was held upright by wire cables. Once much of the material had burned, and the conflagration had subsided but was still actively burning, Beninati and others walked into the fire. At that point, the risk of stumbling on buried fire debris, including the cables which necessarily had collapsed along with the sculpture, was an obvious and inherent one. Thus, the risk of falling and being burned by the flames or hot ash was inherent, obvious, and necessary to the event, and Beninati assumed such risk.

We need not discuss other nonsport activities where the primary assumption of risk doctrine is, or may be, applicable, for we are confident that this case presents an example "where, by virtue of the nature of the activity and the parties' relationship to the activity, [Black Rock] owe[d] no legal duty to protect [Beninati] from the particular risk of harm that caused the injury . . . ." (*Knight, supra,* 3 Cal.4th at pp. 314–315.)

▮ Because an analysis of the doctrine's application is dependent on the facts of each particular case, several of the decisions relied on by Beninati are factually distinguishable, and thus, not dispositive. For example, in *Bush v. Parents Without Partners* (1993) 17 Cal.App.4th 322 [21 Cal.Rptr.2d 178], the Third District Court of Appeal concluded in a two-to-one decision that recreational dancing was neither a sport nor a "dangerous activity" warranting application of the primary assumption of risk doctrine. (*Id.* at p. 328.) Similarly, Division Four of the Second District Court of Appeal focused its analysis in *Record v. Reason, supra,* 73 Cal.App.4th 472, on whether "tubing" (an inner tube pulled through the water by a boat) was a sport. The court's conclusion that "tubing" was a sport avoided any need to discuss whether tubing was the type of activity otherwise encompassed by the doctrine. (*Id.* at p. 482.)[2]

▮ Where, as here, the doctrine of primary assumption of risk has been found to be applicable, it has barred imposition of a duty of care to promoters and operators of such sports and activities, as well as to coparticipants. (See *Souza v. Squaw Valley Ski Corp.* (2006) 138 Cal.App.4th 262 [41 Cal.Rptr.3d 389] [doctrine applied to suit against ski resort for personal injuries resulting from skier's collision with a snow-making hydrant]; *Staten v. Superior Court* (1996) 45 Cal.App.4th 1628 [53 Cal.Rptr.2d 657] [figure skater's personal injury action against rink operator for a cut received in a collision with

---

[2] While the court in *Kindrich v. Long Beach Yacht Club* (2008) 167 Cal.App.4th 1252 [84 Cal.Rptr.3d 824], another two-to-one decision, considered only whether the plaintiff in that case was engaged in an "active sport" at the time of injury, the opinion references other nonsport activities in which primary assumption of risk was applied: "Other examples of primary assumption of risk are the so-called veterinarian's rule [citation] or where the plaintiff is hired to undertake a particular, dangerous job [citations]." (*Id.* at p. 1260.)

another skater barred under doctrine of primary assumption of risk]; *Regents of University of California v. Superior Court* (1996) 41 Cal.App.4th 1040 [48 Cal.Rptr.2d 922] [rock climbing accident subject to doctrine where risk of falling during class was inherent in the activity].)

To use an example found persuasive by the trial court, in *Connelly v. Mammoth Mountain Ski Area* (1995) 39 Cal.App.4th 8 [45 Cal.Rptr.2d 855], the court held that primary assumption of risk applied to immunize a ski resort operator in a personal injury action brought by a skier who was injured after colliding with a ski lift tower. The court noted that snow skiing involves inherent risks, which are obvious and necessary, and that one of those risks is a collision with the apparatus that brings the skiers to the mountain top. "Because of the obvious danger, the very existence of a ski lift tower serves as its own warning. [Citation.]" (*Id.* at p. 12.) Thus, because the plaintiff voluntarily engaged in an activity that involved such inherent and obvious risks necessary to the activity, the ski resort owner owed plaintiff no duty of care with regard to such a risk of injury. (*Ibid.*)

Yet, Beninati then argues that, even if the primary assumption of risk doctrine is applicable to nonsport activities, it should not be applied in this instance either because the dangers were hidden or concealed under the ash and flames, or because Black Rock increased the risk of any inherent injury. We disagree.

First, Beninati misunderstands what is meant by "obvious" when discussing the inherent risk. As used in the context of primary assumption of risk, an obvious risk is one within the contemplation of the activity, whether or not it is actually observed. For example, the court in *Connelly* noted that a risk to skiers includes hazards concealed by the snow surface itself. (*Connelly v. Mammoth Mountain Ski Area, supra*, 39 Cal.App.4th at p. 12.) Likewise here, an obvious risk inherent in the activity undertaken by Beninati was that the flames and ash hid the location of fire embers and Burning Man debris, including the cables which had held up the sculpture. By continuing to walk into the fire, Beninati assumed the risk that he might trip and fall into the fire because he could not see the ground surface. This risk itself is one that is inherent in the burning of the effigy and the Burning Man commemorative ritual.

Beninati's alternative argument that Black Rock increased the risk of harm fails for lack of factual support. In his trial and appellate briefs, Beninati is critical of the lack of supervision of the festival site and the use of wire

cables to stabilize the Burning Man sculpture.[3] However, the record on summary judgment is utterly devoid of any evidence that the use of cables in this fashion was an avoidable risk, or that Black Rock did anything that increased the inherent risk of harm to Beninati normally associated with entering an area surrounded by fire.

For this simple reason, our case is far different from those relied on by Beninati for this point. In *Branco v. Kearny Moto Park, Inc.* (1995) 37 Cal.App.4th 184 [43 Cal.Rptr.2d 392], expert testimony supported the plaintiff's claim against a motocross bicycle racecourse owner that the design of an "expert caliber" jump ramp was unnecessarily dangerous and the risks could have been mitigated without altering the nature of the activity. Similarly, in *Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127 [40 Cal.Rptr.2d 249], a claim that a golf course hole was designed in an unusually dangerous manner was supported by circumstantial evidence showing that other golfers had been repeatedly struck by golf balls at the same location. (See also *Luna v. Vela* (2008) 169 Cal.App.4th 102, 106 [86 Cal.Rptr.3d 588] [triable issue of fact whether placement and type of volleyball net pole lines increased the risk of injury from playing volleyball]; *Lowe v. California League of Prof. Baseball* (1997) 56 Cal.App.4th 112, 123 [65 Cal.Rptr.2d 105] [triable issue of fact whether distraction caused by team mascot increased inherent risk of spectator being struck by foul ball].)

Here, there is no such expert testimony or other evidence raising even a reasonable inference that any action or inaction by Black Rock increased the risk of harm to Beninati, or that such risk could have been mitigated without altering the nature of the ritualistic Burning Man event in which Beninati was participating.

For all of these reasons we conclude that the doctrine of primary assumption of risk applies to the activity engaged in by Beninati at the Burning Man festival, and accordingly, Black Rock owed him no duty of care to prevent the injuries he incurred as a result.

---

[3] As to this last criticism, we note that the record does not support Beninati's claim that he was "caught on a cable or something solid under the ash." His actual statement was that his right foot "caught on something or [he] tripped on something." It may have been a cable or something solid. In any case, we have already explained that even *if* he tripped on a cable, that was an inherent risk of treading through the burning rubble of the collapsed Burning Man sculpture.

## IV.

## DISPOSITION

We affirm the summary judgment. Black Rock is awarded its costs on appeal.

Reardon, J., and Sepulveda, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 17, 2009, S175409.