[No. B224748. Second Dist., Div. Eight. Oct. 27, 2011.]

ROBERT AMEZCUA et al., Plaintiffs and Appellants, v.
LOS ANGELES HARLEY-DAVIDSON, INC., Defendant and Respondent.

## COUNSEL

David Hoffman for Plaintiffs and Appellants.

Manning, Leaver, Bruder & Berberich, Robert D. Daniels and Crystal S. Yagoobian for Defendant and Respondent.

## OPINION

**RUBIN, Acting P. J.**—Plaintiffs and appellants Robert and Nancy Amezcua (individually Robert and Nancy, collectively the Amezcuas) appeal from the summary judgment entered against them and in favor of defendant and respondent Los Angeles Harley-Davidson, Inc. (Harley-Davidson). The Amezcuas sued Harley-Davidson for damages arising out of injuries they suffered in a collision which occurred while they were riding in the 2006 "Pursuit for Kids Toy Drive," a group motorcycle ride organized annually by Harley-Davidson (the 2006 Toy Ride). Appellants contend (1) Harley-Davidson owed a duty of care to the participants in the 2006 Toy Ride; (2) Harley-Davidson is liable under the "peculiar risk" doctrine; (3) Harley-Davidson is jointly liable with the Los Angeles County Police Department; (4) assumption of risk does not apply; (5) the waiver agreement is unenforceable; and (6) Harley-Davidson's gross negligence rendered the release agreement unenforceable. We affirm.[1]

## FACTS

The material facts of the accident itself are undisputed. The 2006 Toy Ride took place on November 26, 2006. Participants could preregister or they could register immediately before the ride at the Harley-Davidson dealership on Paramount Blvd. in South Gate, where the 2006 Toy Ride began. Registration included signing a release form that Harley-Davidson used for all annual Toy Rides. That form stated in part: ". . . I expressly agree to assume the entire risk of any accident or personal injury, including death,

---

[1] This is the second time this case has come before us. In April 2009, we affirmed the trial court's order denying the Amezcuas' petition to file a lawsuit against the County of Los Angeles and excuse their noncompliance with Government Code section 945.4 (presentation of written claim to public entity before suit for money or damages may be filed). (*Amezcua v. County of Los Angeles* (Apr. 13, 2009, B206668) [nonpub. opn.].) Meanwhile, Harley-Davidson cross-complained against the County of Los Angeles and the Los Angeles County Office of Public Safety (the County) for indemnity and contribution. The operative second amended cross-complaint (cross-complaint) alleged that if Harley-Davidson was found liable on the complaint, it would be as a result of the County's negligent planning, organizing, escorting and execution of the route taken by the 2006 Toy Ride.

which I might suffer as a result of my participation in the event whether such risk result from negligence (except willful neglect) on the part of any or all of the Released Parties." The morning of the ride, Los Angeles County Police Sergeant Bradley Sheffield made some opening remarks to the crowd gathered at the dealership. Afterwards, Sheffield and an officer dressed as Santa Claus got into a marked Los Angeles County Police vehicle and led the procession of motorcycles to Harbor-UCLA Medical Center on Carson Street in Torrance, along a route that included the 105 and 110 Freeways. While en route, Sheffield received word that a motorcycle had gone down.

Robert was an experienced motorcyclist and had participated in dozens of organized motorcycle rides, including several prior Toy Rides organized by Harley-Davidson. In the past, Robert had registered to participate in Harley-Davidson organized Toy Rides, including signing the release form. But Robert chose to ride in the 2006 Toy Ride without registering or signing the release. Robert estimated that there were about 200 motorcycles in the 2006 Toy Ride.[2] Robert was driving and Nancy was seated behind him when they left the dealership towards the rear of the procession; they remained in that position throughout the ride. All of the motorcycles in the procession stayed in one lane on the freeways, which Robert referred to as the "motorcycle lane." Robert did not see any vehicles in the motorcycle lane that were not part of the 2006 Toy Ride, although there were a number of vehicles in the other lanes. While on the 110 Freeway, Robert and the other motorcycles were in the lane to the left of the lane in which vehicles transitioning onto the 110 Freeway from the 91 Freeway were traveling. Another motorcycle was riding in the same lane as the Amezcuas, to the Amezcuas' immediate right. Robert first saw a van "way ahead" and in the lane to his right. As traffic got heavier, the lane in which the van was traveling slowed faster than the lane in which Robert was riding; as a result, the distance between Robert's motorcycle and the van shortened. Robert noticed that, although the van was staying within its own lane, it more than once moved closer to the motorcycle lane and then moved away again. Although the van did not have its turning signal on, Robert surmised that the driver of the van was either distracted by the motorcycle procession or he wanted to cross through the line of motorcycles. Robert signaled the motorcycle to his right to slow down so as to create a gap between them and the motorcycles ahead of them for the van to pass through. Robert saw the van hit the car in front of it, but the van did not stop. As Robert slowed down to leave room for the van to pass through the motorcycle lane, the motorcycle to Robert's right sped up to pass the van and

---

[2] No one knew the exact number of motorcycles in the procession. Sheila Vail, marketing manager for Harley-Davidson, recalled that about 250 people registered for the 2006 Toy Ride but there were less than 250 motorcycles in the ride because about two-thirds of the motorcycles were ridden by two people. Sergeant Sheffield estimated that there were between 75 and 100 motorcycles in the procession.

catch up with the procession. At the same moment that motorcycle was pulling ahead of the Amezcuas, the van started to move into the gap Robert had created for the van to pass through. As a result, the other motorcycle and the van were in the gap at the same time. The van almost hit the motorcycle, but swerved back into its lane. The other motorcycle sped up and passed the van, but the van swerved back into the motorcycle lane and, this time, hit the Amezcuas. The record does not reveal the nature or extent of their injuries.

Jose Medina, driver of the van that collided with the Amezcuas, recalled that he was traveling on the southbound 110 Freeway when he was startled by the roar of 15 or 20 motorcycles behind him. Medina could not brake in time to avoid hitting a vehicle in front of him. At the moment Medina hit that vehicle, a motorcycle "also came in, and I don't know how they fell also at the same time. That's all."

## PROCEDURAL BACKGROUND

The Amezcuas filed this action against Harley-Davidson in July 2007. The gravamen of the operative second amended complaint (complaint), filed in October 2007, was that the collision was caused by Harley-Davidson's negligence in organizing the 2006 Toy Ride.

Harley-Davidson sought summary judgment on various theories. One theory was that the Amezcuas claims were barred by the assumption of risk doctrine. The trial court granted summary judgment in favor of Harley-Davidson on this theory, holding that Harley-Davidson owed no duty to the Amezcuas. The trial court also found that Robert had participated in other similar events for which he registered; the Amezcuas elected not to register for the 2006 Toy Ride and thereby avoided signing the release of liability; the Amezcuas should not benefit from their failure to register and sign the waiver for the 2006 Toy Ride. Judgment was entered on February 26, 2010, and notice of entry of judgment was served on March 22, 2010. The Amezcuas timely appealed.

## THE SUMMARY JUDGMENT

A. *Standard of Review*

The standard of review of an order granting summary judgment is well established. We independently review the entire record in the same manner as the trial court. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) Our review is confined to the papers that were before the trial court on the summary judgment motion that is the subject of the appeal. We consider " 'all of the evidence set forth in the [supporting and

opposition] papers, except that to which objections have been made and sustained by the court, and all [uncontradicted] inferences reasonably deducible from the evidence.' [Citation.]" (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 612 [76 Cal.Rptr.2d 479, 957 P.2d 1313].) We view that evidence "in a light favorable to plaintiff as the losing party [citation], liberally construing [their] evidentiary submission while strictly scrutinizing [defendant's] own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143]; accord, *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).)

First, we review the issues framed by the operative pleadings to determine the scope of material issues. Next we determine whether the moving party has discharged its initial burden of production. If we determine the moving party made the requisite prima facie showing of the nonexistence of a triable issue of fact, we then review the opposing party's submissions to determine if a material triable issue exists. (See *Aguilar, supra,* 25 Cal.4th at pp. 850–851; *Todd v. Dow* (1993) 19 Cal.App.4th 253, 258 [23 Cal.Rptr.2d 490].) Summary judgment is appropriate where "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . ." (Code Civ. Proc., § 437c, subd. (c).) "The trial judge's stated reason for granting summary judgment is not binding on us because we review its ruling, not its rationale." (*Reliance Nat. Indemnity Co. v. General Star Indemnity Co.* (1999) 72 Cal.App.4th 1063, 1074 [85 Cal.Rptr.2d 627].) With this standard of review in mind, we summarize the evidence set forth in the supporting and opposing papers.

### B. *Harley-Davidson's Moving Papers*

Sheila Vail, designated by Harley-Davidson as the person most knowledgeable about all of the Harley-Davidson organized Toy Rides between 1999 and 2006, had been the marketing manager for Harley-Davidson since 1996; she also acted as the liaison between Harley-Davidson and the Harley-Davidson owners group (HOG). Harley-Davidson organized the first annual "Pursuit for Kids Toy Drive" in about 2001.[3] The Los Angeles County Police Department provided escort services for the Toy Ride every year since the first Toy Ride. No one from Harley-Davidson escorts the ride. Like prior Toy Rides, participants in the 2006 ride were required to pay an entry fee, sign a motorcycle ride release form (quoted above) and donate a toy. Advertising flyers stated: "To register, just fax the completed release form (on the back of

---

[3] In addition to the Toy Ride, Harley-Davidson puts on numerous "social rides" during the year in which there are typically 100 to 200 participants. One or more Harley-Davidson employees lead the social rides; Harley-Davidson has never used police escorts for any of the social rides and is not required to do so.

this flyer) to . . . or mail to LA Harley." Participants who did not preregister could register at the dealership on the morning of the ride. Had Vail known the Amezcuas did not register she would have told them they could not participate in the 2006 Toy Ride.

Sergeant Sheffield had participated in every Toy Ride since the first one and he was the Los Angeles County Police Department's contact person for the 2006 Toy Ride. He understood the department's role in the 2006 Toy Ride was to tell the riders the route and to obey all laws, and to help them get on the freeway. There were two or three marked Los Angeles County Police patrol cars at the dealership before the 2006 Toy Ride started; these cars joined in the procession with the motorcyclists. There were also two or three marked patrol cars at the freeway off-ramp on Carson Street to show the riders the way to the hospital. The motorcyclists were met at the hospital by another three or four marked patrol cars which were permanently stationed at the hospital. Before the motorcyclists left the Harley-Davidson dealership to begin the 2006 Toy Ride, Sheffield announced over a PA system that the riders had "to follow all laws and so forth, they're told the directions that we're going, and told where we exit the freeway, and when they exit from the freeway, we told them we have parking set up for them at the Harbor UCLA, the hospital where the toys will be taken to the kids." Since he was in the front of the procession, Sheffield did not know what was happening behind him but while en route he received a radio call informing him that a motorcycle had gone down.

At his deposition, Robert testified that between 2002, when he purchased his first Harley-Davidson motorcycle, and 2006, he participated in the Toy Ride twice; both times he registered and signed a waiver. On November 26, 2006, Robert saw the registration table but did not register or sign the waiver because he understood the purpose of registration was "to get a little pin and the dinner at the end of it. . . . I wasn't planning to go to the lunch, nor did I care about receiving the little pin." Robert did not tell anyone that he was going to participate in the 2006 Toy Ride without registering; no one told him he could not do so. Robert did not notice any difference between the escort services at the 2006 Toy Ride and those services at the other organized rides in which he participated.

C. *The Amezcuas' Opposing Papers*

Vail recalled that Harley-Davidson asked the Los Angeles County Police to be involved in the toy rides because Harley-Davidson felt some responsibility for getting riders safely from the Harley-Davidson dealership to the end point of the ride. No one from Harley-Davidson discussed the details of the police escort for the 2006 Toy Ride with anyone at the Los Angeles County Police

Department, or what would happen if someone involved in the 2006 Toy Ride was involved in an accident during the ride. Years ago Vail discussed with Eric Lemke, who handles insurance for Harley-Davidson, some of the special risks of a ride like the 2006 Toy Ride, including riders riding next to each other. To ensure the safety of participants in the 2006 Toy Ride, Harley-Davidson asked everyone to sign a release that would cause people to "acknowledge that they're familiar with their motorcycle's abilities and to ride within their abilities." The registration table outside the dealership the morning of the 2006 Toy Ride was staffed by HOG volunteers. They were not given a script of what to say to registrants or any written instructions. Vail did not recall telling the volunteer registration staff the importance of getting each person to sign a release, but the volunteers were all experienced riders whom she expected to understand that fact. Vail did not tell them that a person who did not register would not be permitted to ride; she told them a person who did not register would not be given a meal ticket. No one announced over the loudspeaker that anyone who did not register could not join the ride. There was nothing posted at the dealership stating that riders were assuming the risk of participating in the 2006 Toy Ride. When Vail saw Robert Amezcua at the dealership about half an hour before the ride started, she knew he had not preregistered for the 2006 Toy Ride but she did not talk to him about registering. Vail was later told that it was the Amezcuas who were involved in an accident during the 2006 Toy Ride.

Sheffield recalled that some time in late October or early November 2006, he obtained permission to participate in the 2006 Toy Ride from the Chief of the Los Angeles County Police. Sheffield was not aware of any permit requirement for the 2006 Toy Ride. He advised the California Highway Patrol (CHP) that there would be an assembly of motorcycles on the freeway that day but CHP could not assist because its officers were all going to be engaged in DUI (driving under the influence) checkpoints.[4] Sheffield understood that in any procession there is the risk of participants not paying attention, following too closely and running into each other; Sheffield was not aware of any risks posed by nonparticipants. Sheffield had no specific training on handling a police escort or motorcade. He did not know of any policies and procedures that discuss the number of people required to safely assist a motorcade. The Los Angeles County Police Department did not have any written policies or procedures covering police escorts or motorcades. No entity, including the Los Angeles County Police Department, provided official "escort services" for the 2006 Toy Ride. Officers were told to break traffic (i.e., shut down the freeway) only if there was an emergency. Sheffield understood the purpose of the 2006 Toy Ride was to make it possible for

---

[4] On November 22, 2006, the Los Angeles County Police issued a press release about the 2006 Toy Ride which stated, in pertinent part, "The LA County Police will escort the riders, and the CHP will also provide a motorcycle escort."

HOG chapter members to participate in a toy drive for children. He understood that the people who elected to ride a motorcycle in the 2006 Toy Ride were responsible for their own safety and participated in the ride at their own risk. He did not see it as the job of the Los Angeles County Police or Harley-Davidson to get the riders safely from the Harley-Davidson dealership to the end point of the 2006 Toy Ride. Sheffield saw the role of the Los Angeles County Police Department in the 2006 Toy Ride as informing the riders of the route, telling them to obey all laws, assisting them to get on and off the freeway and directing them to the appropriate parking place once they arrived at the hospital. This is what Sheffield communicated to the participants in his opening remarks at the dealership before the 2006 Toy Ride began. He did not tell the riders that they were riding at their own risk because they had signed a waiver that advised them of that fact. Based on officer availability and what Sheffield understood their responsibilities to be during the 2006 Toy Ride, Sheffield determined that two to three Los Angeles County Police patrol cars, plus his own lead car, were sufficient support for the 2006 Toy Ride. Harley-Davidson had people stationed at the dealership making sure the riders got safely out of the dealership and onto the street. The patrol cars that were at the dealership before the 2006 Toy Ride began followed behind Sheffield but he did not know exactly where in the procession of motorcycles the patrol cars were located.

Robert, a member of HOG, testified that the 2006 Toy Ride was announced at the monthly HOG meeting. He saw the registration table set up when he arrived at the 2006 Toy Ride. Although he registered and signed waivers for prior rides, Robert did not do so for the 2006 Toy Ride; he did not believe registration had anything to do with the waiver. No one told Robert that he could not participate in the ride if he did not register. Robert recognized the police officer making remarks at the start of the 2006 Toy Ride as the same officer that led past rides; Robert understood that the officer was giving last minute instructions for the ride but did not pay attention to what the officer was saying. The officer announced something about not having all of the escorts he expected that day, but that the ride was going to go forward anyway. Prior to the 2006 Toy Ride, Robert had participated in a number of toy rides with different organizations. He recalled that in the Glendale Harley-Davidson toy ride, officers stopped traffic at every intersection and blocked every on-ramp along the route. Robert had participated in numerous toy rides with the Frontline Warriors in which between 12 and 40 motorcycles participated. Prior to the Frontline Warrior rides, the participants discussed the route, safety issues including watching out for other vehicles, blocking traffic and following traffic rules. Frequently, other vehicles slow down to watch the procession, in which case one of the escorts would ride up next to the offending vehicle and ask it to move. Robert understood that there would be some kind of escort for the 2006 Toy Ride. Robert recalled that

there were escorts at prior Harley-Davidson Toy Rides, including people blocking traffic so that the riders could get on the freeway; he did not notice escorts blocking any other traffic during prior rides and he did not notice fewer people, people not performing their duties or anything else different about the 2006 Toy Ride.

## D. *Harley-Davidson's Reply Papers*

The 2006 Toy Ride was not a profitmaking endeavor for Harley-Davidson. The registration fee was used to defray some of the costs of putting on the event, including food and beverages and purchasing the pins that were given out to registered participants.

## DISCUSSION

### A. *The Amezcuas' Claims Are Barred by the Primary Assumption of Risk Doctrine*

The Amezcuas contend that the trial court erred in granting summary judgment to Harley-Davidson based on assumption of risk. They argue that the primary assumption of risk doctrine does not apply for two reasons: (1) it applies only where there is a written exculpatory agreement between the parties and there is no such agreement in this case; and (2) it applies only to sporting events and the 2006 Toy Ride was not a sporting event.[5] We find neither argument persuasive.

 Whether the assumption of risk doctrine applies in a particular case is a question of law. (*Beninati v. Black Rock City, LLC* (2009) 175 Cal.App.4th 650, 656 [96 Cal.Rptr.3d 105] (*Beninati*); *Moser v. Ratinoff* (2003) 105 Cal.App.4th 1211, 1217 [130 Cal.Rptr.2d 198] (*Moser*); *Record v. Reason* (1999) 73 Cal.App.4th 472, 479 [86 Cal.Rptr.2d 547] (*Record*); *Staten v. Superior Court* (1996) 45 Cal.App.4th 1628, 1632 [53 Cal.Rptr.2d 657].)

### B. *The Primary Assumption of Risk Doctrine Is Not Limited to Written Exculpatory Agreements*

 As a general rule, persons have a duty to use due care to avoid injury to others, and may be held liable if their careless conduct injures another

---

[5] Although the trial court granted summary judgment on the ground that the primary assumption of risk doctrine was a complete defense to the Amezcuas' negligence claims, their opening brief touches on the doctrine only tangentially, in the context of the argument that the waiver agreement was void as against public policy. Because we conclude that the doctrine is a complete bar to the Amezcuas' claims, we need not discuss any of the other issues raised in their briefs.

person. (See Civ. Code, § 1714; *Knight v. Jewett* (1992) 3 Cal.4th 296, 315 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*).) But "assumption of risk" can be a complete defense to a claim of negligence. Assumption of risk may be express *or* implied. Express assumption of risk concerns "instances in which, as the result of an express agreement, the defendant owes no duty to protect the plaintiff from an injury-causing risk." (*Knight*, at p. 308, fn. 4.) It is analogous to *implied* primary assumption of risk. (*Ibid.*) As we explain in greater detail in the next part, implied primary assumption of risk is founded not on an express agreement, but on the nature of the activity and the relationship of the parties to that activity. Accordingly, in *Moser, supra*, 105 Cal.App.4th at pages 1217–1218, the court found that the plaintiff's written release of " 'event holders, sponsors and organizers' " was inapplicable to the coparticipant in the activity that caused the plaintiff's injuries because the coparticipant was not a party to the agreement. Nevertheless, the court found that the implied primary assumption of risk doctrine barred the plaintiff's claims against the coparticipant who was not a party to the written agreement. (See also *Levinson v. Owens* (2009) 176 Cal.App.4th 1534 [98 Cal.Rptr.3d 779] (*Levinson*) [applying primary assumption of risk to a party guest injured when she fell off a horse owned by the host].)

In this case, whether the Amezcuas signed the motorcycle release agreement that was part of the registration materials is not determinative of whether the implied primary assumption of risk doctrine applies. As we explain in the next parts, the doctrine does apply.

C. *Riding a Motorcycle in the 2006 Toy Ride Is an Activity to Which the Primary Assumption of Risk Doctrine Applies*

■ *Knight, supra*, 3 Cal.4th 296, is the seminal case on the implied assumption of risk doctrine. In *Knight*, our Supreme Court distinguished between two categories of cases that fall within the assumption of risk rubric: primary assumption of risk cases and secondary assumption of risk cases. In primary assumption of risk cases, the defendant has no duty to protect the plaintiff from a particular risk and the plaintiff's recovery against the defendant is completely barred. In secondary assumption of risk cases, the defendant owes the plaintiff a duty but the plaintiff knowingly encounters a risk of injury caused by the defendant's breach of duty; rather than acting as a complete bar to recovery, secondary assumption of risk requires a comparative fault analysis. Whether the primary or secondary assumption of risk doctrine applies to a particular case depends on the nature of the activity in which the defendant was engaged and the relationship of the defendant and the plaintiff to that activity. (*Knight, supra*, 3 Cal.4th at pp. 308–309, 314; *Record, supra*, 73 Cal.App.4th at p. 480; see also 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1342, p. 749.) "Rather than being dependent on

the knowledge or consent of the particular plaintiff, resolution of the question of the defendant's liability in such cases turns on whether the defendant had a legal duty to avoid such conduct or to protect the plaintiff against a particular risk of harm. . . . [T]he nature of a defendant's duty in the sports context depends heavily on the nature of the sport itself. Additionally, the scope of the legal duty owed by a defendant frequently will also depend on the defendant's role in, or relationship to, the sport." (*Knight*, at pp. 316–317.) " 'The overriding consideration in the application of primary assumption of risk is to avoid imposing a duty which might chill vigorous participation in the implicated activity and thereby alter its fundamental nature.' [Citation.]" (*Moser, supra*, 105 Cal.App.4th at p. 1219.)

Although *Knight* applied primary assumption of risk to coparticipants in a touch football game, the primary assumption of risk doctrine is not limited to competitive sports (or even to coparticipants). In *Ford v. Gouin* (1992) 3 Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724] (*Ford*), a companion case to *Knight*, the court expressly rejected a contention that primary assumption of risk applied only to competitive sports and held, instead, that it applied to the noncompetitive recreational activity of a ski boat driver towing a water skier. The court in *Ford* reasoned that, like competitive sports, vigorous participation in noncompetitive sports would likely be chilled and the nature of the sport altered if liability were to be imposed for ordinary careless conduct. (*Id.* at p. 345.) "Accordingly, the general rule limiting the duty of care of a coparticipant in active sports to the avoidance of intentional and reckless misconduct, applies to participants engaged in noncompetitive but active sports activity, such as a ski boat driver towing a water-skier." (*Ibid.*) The court concluded, "In light of such a limited duty owing to plaintiff, it would clearly appear that summary judgment in favor of defendant properly was entered, because plaintiff's evidence indicates that defendant was, at most, careless in steering the boat." (*Id.* at p. 345.)

In *Record, supra*, 73 Cal.App.4th 472, the court chronicled the activities to which courts had to that date applied primary assumption of risk (water skiing, sport fishing, white water rafting) and those to which courts had found the doctrine inapplicable (recreational dancing) and articulated the following test for application of the doctrine: "[A]n activity falls within the meaning of 'sport' if the activity is done for enjoyment or thrill, requires physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury." (*Id.* at p. 482 [riding an inner tube towed by a motorboat is an activity subject to primary assumption of risk].)

In *Shannon v. Rhodes* (2001) 92 Cal.App.4th 792, 797 [112 Cal.Rptr.2d 217], the court agreed with the basic criteria set forth in *Record* but added that its "review of *Knight* and subsequent cases leads us to conclude, 'sport'

as intended by the *Knight* court necessarily entails some pitting of physical prowess (be it strength based [i.e., weight lifting], or skill based, [i.e., golf]) against another competitor or against some venue." The *Shannon* court concluded that being a passenger in a boat is "too benign" to be subject to primary assumption of risk.[6] (*Shannon,* at p. 798.) The court in *Shannon* reasoned that the *Ford* court "focused on the physical skill and risk involved in the waterskiing itself to conclude that the activity of waterskiing was a sport, and the boat driver a coparticipant in that sport. . . . The same certainly cannot be said of a mere passenger in a boat, particularly when the boat is simply a pleasurable means of transportation. To conclude otherwise would mean that because a car can be used in a race, that riding in a car is participation in a sport. We perceive the cat[e]gorization as a sport to turn not just on the thing used (in this case a boat) but also on the manner of use." (*Id.* at p. 798, citation omitted; see also *Bush v. Parents Without Partners* (1993) 17 Cal.App.4th 322, 328 [21 Cal.Rptr.2d 178] [reversing summary judgment granted against plaintiff who slipped and fell while dancing and in favor of defendant who sponsored the event and public agency that owned the dance hall, reasoning that recreational dancing does not fall within the ambit of *Knight* because it is not a potentially dangerous sport or activity].)

In *Moser, supra,* 105 Cal.App.4th at page 1215, the primary assumption of risk doctrine was applied to an organized, noncompetitive, bicycle ride in which one rider collided with another rider. Applying *Record,* the court reasoned that, although bicycle riding, like driving an automobile, can be a means of transportation, "organized, long-distance bicycle rides on public highways with large numbers of riders involve physical exertion and athletic risks not generally associated with automobile driving or individual bicycle riding on public streets or on bicycle lanes or paths. Bicycle rides of the nature engaged in by the parties here are activities done for enjoyment and a physical challenge. . . . In view of these considerations, the organized, long-distance, group bicycle ride qualifies as a 'sport' for purposes of the application of the primary assumption of risk doctrine." (*Id.* at p. 1221, fn. omitted.)

In *Truong v. Nguyen* (2007) 156 Cal.App.4th 865 [67 Cal.Rptr.3d 675] (*Truong*), two personal watercrafts (strangers to one another) collided, resulting in injury to one of the drivers and the death of that driver's passenger. The court concluded that "the primary assumption of risk doctrine applies to the activity of riding personal watercraft, regardless of whether the rider is operating the vessel." (*Id.* at p. 887.) "[R]iding as a passenger on a personal watercraft, meets the test from *Record,* because it 'is done for enjoyment or thrill, requires physical exertion as well as elements of skill, and involves a

---

[6] The injured passenger in *Shannon* was a six year old who fell out of the defendant's ski boat and was severely injured by the boat's propellers.

challenge containing a potential risk of injury.' [Citation.]" (*Id.* at p. 888.) The *Truong* court distinguished *Shannon*, observing, "Unlike the benign activity of riding in a boat, riding a personal watercraft requires physical exertion and balance by the passenger to hold on to the operator or grips or handles on the vessel to avoid being thrown off or rolling off the craft. [Citation.]" (*Id.* at p. 889.) It rejected the contention that primary assumption of risk should be applied only to "extreme" operation of personal watercraft and not to "casual" or "ordinary" operation. (*Id.* at pp. 890–891.)

Applying the doctrine to the sport of motorcycle "off-roading," the court in *Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1254 [102 Cal.Rptr.2d 813], held that a participant in that activity may not sue a coparticipant for negligence because the activity involved an inherent risk that participants may be involved in collisions causing death or serious injury. And in *Rosencrans v. Dover Images, Ltd.* (2011) 192 Cal.App.4th 1072, 1083 [122 Cal.Rptr.3d 22], the court held that, although falling down and being struck by other riders is an inherent risk of motocross, the owner of a motocross track (as opposed to a coparticipant) has a duty to minimize that risk by providing an adequate system to warn other riders of a fallen rider.

Some courts have expanded the application of primary assumption of risk beyond "sports" to activities that might be accurately described as "recreational." For example, in *Beninati, supra*, 175 Cal.App.4th at page 656, the sole issue on appeal was whether the primary assumption of risk doctrine applied to the annual Burning Man Festival at which attendees are encouraged to engage in the ritual of depositing an item in the flames. The plaintiff, who was severely burned when he did so, argued that the doctrine applied only to " 'rule-based' sports or, or at a minimum, to 'active sports.' " (*Id.* at p. 658.) The appellate court disagreed. It reasoned that, although *Knight* involved a touch football game, the opinion made reference to other applications of the rule to obviously dangerous activities, like firefighting. The court found that "[t]he risk of injury to those who voluntarily decide to partake in the commemorative ritual at Burning Man is self-evident. . . . [T]he risk of stumbling on buried fire debris . . . was an obvious and inherent one." (*Id.* at pp. 658–659.) The court concluded that the doctrine applied to activities like the Burning Man Festival which involve "inherent risk of injury to voluntary participants . . . where the risk cannot be eliminated without altering the fundamental nature of the activity. [Citation.]" (*Id.* at p. 658.)

■ We have found no case that considers primary assumption of risk in connection with organized, noncompetitive, recreational motorcycle riding. However, we find that activity falls within those activities as to which the primary assumption of risk has been found to apply. Riding a motorcycle is

much like riding a personal watercraft.[7] It involves physical exertion and athletic risks not generally associated with automobile driving. Participating in an organized motorcycle ride along public highways with large numbers of riders is more similar to an organized bicycle ride than it is to being a mere passenger in a boat, a recreational dancer or a lone motorcyclist. Like the risk of being burned while participating in the Burning Man Festival ritual, the risk of being involved in a traffic collision while riding in a motorcycle procession on a Los Angeles freeway is apparent. For these reasons, we conclude that riding a motorcycle in the 2006 Toy Ride qualifies for application of the primary assumption of risk doctrine.

### D. *Harley-Davidson Did Not Increase the Danger Inherent in the Activity*

■ Although we conclude that primary assumption of risk applies to an organized motorcycle ride on public highways, we must still determine whether Harley-Davidson did anything to increase the risks inherent in that activity. This is because, although defendants do not have a duty to protect the plaintiff from risks inherent in the activity, they do have a duty not to increase the risk of harm beyond what is inherent in the activity. (See *Luna v. Vela* (2008) 169 Cal.App.4th 102, 108 [86 Cal.Rptr.3d 588], and cases cited therein.) In *Knight*, the court explained that while a coparticipant could not be held liable for an injury resulting from a carelessly thrown ball or bat during a baseball game, he or she could be held liable for intentionally injuring another player or engaging in "reckless conduct that is totally outside the range of the ordinary activity involved in the sport." (*Knight, supra*, 3 Cal.4th at pp. 318, 319, 320.)

■ Neither *Knight* nor its progeny have limited application of the primary assumption of risk doctrine to coparticipants in an activity. (See, e.g., *Beninati, supra*, 175 Cal.App.4th at pp. 659–660, and cases cited therein.) Courts have held coparticipants, coaches and instructors, equipment manufacturers, property owners, organizers and sponsors, to name just a few potential defendants, to different standards of care depending on their relationship to the activity. (*Knight, supra*, 3 Cal.4th at p. 318.) In each case, "the question whether the defendant owed a legal duty to protect the plaintiff from a particular risk of harm does not turn on the reasonableness or unreasonableness of the plaintiff's conduct, but rather on the nature of the activity or sport in which the defendant is engaged and the relationship of the defendant and the plaintiff to that activity or sport." (*Id.* at p. 309.) *Knight* offered the following illustrative example: "[A]lthough moguls on a ski run pose a risk of harm to skiers that might not exist were these configurations removed, the

---

[7] In *Truong*, the court noted that the Oxford English Dictionary defines "Jet Ski" as " 'a small, jet-propelled vehicle which skims across the surface of water and is ridden in a similar way to a motorcycle.' " (*Truong, supra*, 156 Cal.App.4th at p. 883.)

challenge and risks posed by the moguls are part of the sport of skiing, and a ski resort has no duty to eliminate them. [Citation.] . . . [¶] [A]lthough a ski resort has no duty to remove moguls from a ski run, it clearly does have a duty to use due care to maintain its towropes in a safe, working condition so as not to expose skiers to an increased risk of harm. . . . [T]he latter type of risk, posed by a ski resort's negligence, clearly is not a risk (inherent in the sport) that is assumed by a participant. [Citation.]" (*Knight, supra,* at pp. 315–316.) ■ Whether a particular risk is an inherent part of an activity " 'is necessarily reached from the common knowledge of judges, and not the opinions of experts.' [Citation.]" (*Rosencrans v. Dover Images, Ltd., supra,* 192 Cal.App.4th at p. 1083.) Analyzing the liability of parties other than coparticipants requires defining " 'the risks inherent in the sport not only by virtue of the nature of the sport itself, but also by reference to the steps the sponsoring business entity reasonably should be obligated to take in order to minimize the risks without altering the nature of the sport.' [Citation.]" (*Ford v. Polaris Industries, Inc.* (2006) 139 Cal.App.4th 755, 774 [43 Cal.Rptr.3d 215], italics omitted, quoting *Knight, supra,* 3 Cal.4th at p. 317.)

In *Saffro v. Elite Racing, Inc.* (2002) 98 Cal.App.4th 173 [119 Cal.Rptr.2d 497] (*Saffro*), the plaintiff suffered seizures after running in a marathon. He sued the race organizer for negligence arising from the fact that the organizer failed to provide adequate water and electrolyte fluids along the course. In opposition to summary judgment, the plaintiff presented evidence that marathoners commonly expect water and electrolyte fluids to be available along the course. The appellate court reversed the trial court's grant of summary judgment, reasoning that the case did not fall within the primary assumption of risk doctrine because the organizer of a marathon has a duty to produce a reasonably safe event, which included providing marathoners with water and electrolyte fluids. (*Id.* at p. 179.)

In *Levinson, supra,* 176 Cal.App.4th 1534, the defendant granted the request of the plaintiff, a guest at a social gathering at the defendant's cattle ranch, to ride one of the defendant's horses. After she fell off the horse and was injured, the guest brought a negligence action against her host. On appeal from summary judgment granted in favor of the defendant-host, the plaintiff conceded that primary assumption of risk applied to horseback riding, but contended that there were triable issues of fact as to whether the defendant breached a duty to not increase the risk of harm inherent in riding by giving her an inappropriate horse. The appellate court affirmed summary judgment. Distinguishing a social host from a riding coach, instructor, commercial operator of a trail riding business or sponsors of a horseback riding event, the court held that the defendant-social host owed no duty to the plaintiff under the circumstances. The court in *Levinson* also distinguished *Luna v. Vela, supra,* 169 Cal.App.4th 102, in which the court held that tripping over a tie line was an inherent risk of volleyball, but the organizer of a front yard

volleyball game had a duty to erect the volleyball net in a manner not to increase the risk of tripping by making the tie lines more visible. In *Levinson*, the court explained, the defendant did nothing to increase the risk of riding a horse.

In *Beninati, supra*, 175 Cal.App.4th at page 661, the court rejected the plaintiff's argument that the defendant increased the risk of harm by failing to adequately supervise the Burning Man Festival site, noting that there was no "expert testimony or other evidence raising even a reasonable inference that any action or inaction by Black Rock increased the risk of harm to Beninati, or that such risk could have been mitigated without altering the nature of the ritualistic Burning Man event in which Beninati was participating." (*Ibid.*; but see *Rosencrans v. Dover Images, Ltd., supra*, 192 Cal.App.4th at p. 1084 [providing caution flaggers would provide riders with information but would not alter sport of motocross].)

■ Here, no expert testimony is necessary to tell us that collision with other vehicles is an inherent risk of traveling a Los Angeles freeway on any given day. Common sense tells us that the risk is that much greater when riding in a procession of 200 motorcycles. As Robert testified at his deposition, the line of motorcycles "could cause traffic to slow down, because it's a parade-type fashion and people will start gawking and looking, and not really paying attention to the driving. That could cause some backup, to a degree." Thus, traffic slowing and other drivers not paying attention are inherent risks of riding in an organized motorcycle ride on public highways. Nothing that Harley-Davidson did or did not do *increased* this risk. This case is not like *Saffro, supra*, 98 Cal.App.4th 173, in which there was evidence that marathoners commonly expected the race organizer to provide hydration stations for the runners and the failure to do so caused the plaintiff's injuries. Here, Robert testified that, although some did, not all organized motorcycle rides had police escorts. For example, Robert had participated in numerous Frontline Warriors organized rides which entailed riders getting together, riding to a fixed destination and handing out toys. There was no evidence that the absence of a police escort *increased* the inherent danger of riding in an organized motorcycle ride. Nor was there evidence that anything less than closing the freeway to other traffic would have mitigated the risks. But to close the freeways to other traffic during the ride would alter the parade-like nature of riding in a motorcycle procession on a public highway. (*Beninati, supra*, 175 Cal.App.4th at p. 661.) Under these circumstances, the primary assumption of risk doctrine barred recovery from Harley-Davidson.

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

Flier, J., and Grimes, J., concurred.

A petition for a rehearing was denied November 28, 2011.