HARTING, Appellant,

v.

DAYTON DRAGONS PROFESSIONAL BASEBALL
CLUB, L.L.C., et al., Appellees.

[Cite as *Harting v. Dayton Dragons Professional Baseball
Club, L.L.C.*, 171 Ohio App.3d 319, 2007-Ohio-2100.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 21647.

Decided April 27, 2007.

Christopher B. Epley, for appellant.

Stephen V. Freeze, for appellees Dayton Dragons Professional Baseball Team.

Jay R. Langenbahn and Edward Roberts, for appellee The Famous San Diego Chicken.

DONOVAN, Judge.

{¶ 1} Plaintiff-appellant, Roxane Harting, appeals a decision of the Montgomery County Court of Common Pleas that sustained the motions for summary judgment of defendant-appellees Dayton Dragons Professional Baseball Club (hereinafter, "the Dragons") and the Famous San Diego Chicken (hereinafter, "the Chicken") filed on August 5, 2005, and March 6, 2006, respectively. Harting filed an amended notice of appeal of the trial court's decision with respect to both defendants on February 2, 2007.

I

{¶ 2} On June 16, 2004, Harting attended a baseball game between the Dragons and the Wisconsin Timber Rattlers at Fifth Third Field in downtown Dayton, Ohio. For this particular game, the Dragons contracted for the services of the Chicken to entertain the crowd throughout the course of the game. Harting was seated with her boyfriend, Chet Davis, and his family along the third base line directly behind the dugout in the front row.

{¶ 3} During the bottom of the sixth inning, a player for the Dragons hit a line drive foul ball into the stands along the third-base line. Harting was struck in the head and knocked unconscious by the foul ball when it entered the stands. Once her companions realized that she was injured, Harting was transported by ambulance to Miami Valley Hospital.

{¶ 4} On April 5, 2005, Harting filed a complaint against the Dragons and the Chicken, alleging personal injuries sustained as a result of her attendance at the baseball game. Harting argued that the Chicken hired to entertain the crowd during the baseball game constituted an intervening cause outside the normal course of the game, which negated her duty of assumed risk in regard to accepted

dangers associated with the game. Thus, Harting contends that "appellees were negligent in conducting a form of entertainment other than that of baseball and failing to provide additional safety measures and precautions," all of which resulted in her injuries.

{¶ 5} The Dragons filed their motion for summary judgment on August 5, 2005. Harting filed her response on October 24, 2005. On November 7, 2005, the trial court sustained the Dragons' motion for summary judgment. Harting filed a notice of appeal with this court on November 23, 2005. Her appeal was subsequently dismissed as unripe in light of the Chicken's inclusion in the case. On March 6, 2006, the Chicken filed its motion for summary judgment. That motion was ultimately sustained by the trial court on May 30, 2006. On appeal, Harting challenges the trial court's grant of summary judgment for both the Dragons and the Chicken.

## II

{¶ 6} An appellate court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. We apply the same standard as the trial court, viewing the facts in the case in a light most favorable to the nonmoving party and resolving any doubt in favor of the nonmoving party. *Viock v. Stowe–Woodward Co.* (1983), 13 Ohio App.3d 7, 12, 13 OBR 8, 467 N.E.2d 1378.

{¶ 7} Pursuant to Civil Rule 56(C), summary judgment is proper if:

{¶ 8} "(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 364 N.E.2d 267. To prevail on a motion for summary judgment, the party moving for summary judgment must be able to point to evidentiary materials that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. The nonmoving party must then present evidence that some issue of material fact remains for the trial court to resolve. Id.

## III

{¶ 9} Harting's sole assignment of error is as follows:

{¶ 10} "The trial court erred to the prejudice of appellant by sustaining appellees' motion[s] for summary judgment."

{¶ 11} In her sole assignment, Harting contends that the trial court erred when it sustained appellees' respective motions for summary judgment. Harting agrees that she assumed the risk of being struck by a foul ball when she initially entered the ballpark. However, she argues that the distraction caused by the presence of the Chicken while the game was being played was such that she was absolved from any legal obligation to be on the watch for foul balls entering the stands. At the very least, Harting argues that a genuine issue of material fact exists with respect to her claim in order to withstand summary judgment.

{¶ 12} Primary assumption of risk is a defense generally applied in cases in which there is a lack of duty owed by the defendant to the plaintiff, and it is a complete bar to recovery. *Anderson v. Ceccardi* (1983), 6 Ohio St.3d 110, 114, 6 OBR 170, 451 N.E.2d 780. "In that form, while there is a knowledge of the danger and acquiescence in it on the part of the plaintiff, there is also no duty owed by defendant to the plaintiff." *Willoughby v. Harrison Radiator, Div. of Gen. Motors Corp.* (May 11, 1989), Montgomery App. No. 11225, 1989 WL 49482. This type of assumption of risk is typified by the baseball cases in which a plaintiff is injured when a baseball is hit into the stands. *Anderson*, 6 Ohio St.3d at 114, 6 OBR 170, 451 N.E.2d 780, citing *Cincinnati Baseball Club Co. v. Eno* (1925), 112 Ohio St. 175, 147 N.E. 86.

{¶ 13} The following standard was enunciated in *Cincinnati Baseball Club Co. v. Eno* in regard to a spectator's assumption of risk at a baseball game:

{¶ 14} "The consensus of * * * opinions is to the effect that it is common knowledge that in baseball games hard balls are thrown and batted with great swiftness, that they are liable to be thrown or batted outside the lines of the diamond, *and that spectators in positions which may be reached by such balls assume the risk thereof.*" (Emphasis added.)

{¶ 15} In *Borchers v. Winzeler Excavating Co.* (1992), 83 Ohio App.3d 268, 273, 614 N.E.2d 1065, we stated the following:

{¶ 16} "In baseball games, management performs its duties towards spectators when it provides screened seats in the grandstand and gives spectators the opportunity of occupying them." *Cincinnati Baseball Club Co. v. Eno* (1925), 112 Ohio St. 175, 147 N.E. 86. "The timorous may stay at home." *Murphy v. Steeplechase Amusement Co.* (1929), 250 N.Y. 479, 166 N.E. 173."

{¶ 17} After thoroughly reviewing the record, we hold that the doctrine of primary assumption of the risk is applicable to the facts of this case. Thus, it acts as a complete bar to any recovery by Harting. Initially, it should be noted that the Dragons provided a number of warnings to spectators at Fifth Third Field with respect to the risks and dangers associated with the sport of baseball, including injury occurring as a result of batted balls and stray bats entering the

stands. Management at Fifth Third Field made three announcements over the loudspeaker on the day Harting was injured that spectators should be on the lookout for foul balls. The first announcement was made just prior to the beginning of the game. The other announcements were made during the second and fourth innings. Although she arrived at the game almost an hour before it started, Harting testified that she did not hear any of these announcements. Additionally, all spectators' tickets, including Harting's, contained a warning disclaiming all liability from the inherent risks and danger associated with the game. The warning stated:

{¶ 18} *"WARNING:*

{¶ 19} "The holder assumes all risk incidental to the game of baseball, whether occurring prior to, during or subsequent to, the actual playing of the game, including but not limited to the risk of being injured by thrown bats and thrown or batted balls, and agrees that the management and their agents are not liable from injuries resulting from such cases."

{¶ 20} In discussing the incident at her deposition, Harting stated:

{¶ 21} "Q: Were you watching the batter when he hit the foul ball?

{¶ 22} "Harting: No.

{¶ 23} "Q: Were you looking somewhere else?

{¶ 24} "Harting: Yes.

{¶ 25} "Q: Where were you looking?

{¶ 26} "Harting: Straight ahead interacting with the San Diego Chicken.

{¶ 27} "Q: When you say interacting, what do you mean?

{¶ 28} "Harting: I shouldn't say interacting. Laughing.

{¶ 29} "Q: So you were watching the San Diego chicken instead of the batter?

{¶ 30} "Harting: Yes.

{¶ 31} "Q: You understood that they were not stopping the game while you watched the San Diego chicken?

{¶ 32} "Harting: I was aware the game was still going on.

{¶ 33} "Q: You were aware there was still a batter up to bat?

{¶ 34} "Harting: Yes.

{¶ 35} "Q: And you knew that the pitcher was pitching the ball to the batter?

{¶ 36} "Harting: I wasn't paying that much attention to the game as to the— you know that it was being pitched at that moment.

{¶ 37} " * * *

{¶ 38} "Q: You realized that foul balls were a risk when you attend a baseball game?

{¶ 39} "Harting: Yes.

{¶ 40} " * * *

{¶ 41} "Q: Okay. Even if you didn't read the ticket, you understood that foul balls going into the stands are a risk of attending the baseball game?

{¶ 42} "Harting: Yes.

{¶ 43} "Q: So you didn't really need the ticket to tell you that, if the ticket, in fact, had a warning on it about foul balls or thrown or batted balls?

{¶ 44} "Harting: Correct.

{¶ 45} " * * *

{¶ 46} "Q: Would you agree that possibly any pitch could result in a foul ball being hit into the stands?

{¶ 47} "Harting: Yes.

{¶ 48} "Q: So it would be important to watch every pitch during the game, would you agree?

{¶ 49} "Harting: Especially now, yes."

{¶ 50} In light of the answers that she provided during her deposition, Harting clearly understood the inherent dangers associated with being a spectator at a baseball game. Harting stated that she understood that one must pay attention to the game being played so as to avoid being struck by a foul ball or piece of broken bat launched into the stands. It is also worthy of note that Harting does not claim that the Chicken was obscuring her view of home plate or the flight path that the foul ball traveled when it struck her. Had Harting been paying attention, she would have had a clear view of the action taking place in the game and an opportunity to avoid the foul ball. Instead, Harting was watching the Chicken.

{¶ 51} Harting argues that because she was distracted by the antics of the Chicken, who was allegedly performing during the game, she was relieved from the assumption of any inherent risk associated with the game. This argument ignores the fact that team mascots and their antics are common phenomena and the mascots are normally present during the entire course of the game. In many cases, the team mascots are more popular than the team itself. The fact that the Chicken appeared while the game was being played does not absolve Harting from the duty to protect herself from the ordinary risks inherent in the sport. As noted by the Dragons, Harting knew the game was still in play, and she was

aware that a batter was at the plate. Thus, she had a duty to be on the lookout for errant balls entering the stands.

{¶ 52} "The nature of the sporting activity is highly relevant in defining the duty of care owed by a particular defendant: 'What constitutes an unreasonable risk under the circumstances of a sporting event must be delineated with reference to the way the particular game is played, i.e., the rules and customs that shape the participant's ideas of foreseeable conduct in the course of the game.'" *Bundschu v. Naffah* (2002), 147 Ohio App.3d 105, 2002-Ohio-607, 768 N.E.2d 1215, ¶ 36, quoting *Thompson v. McNeill* (1990), 53 Ohio St.3d at 105, 559 N.E.2d 705. Essentially, the analysis turns on whether the spectator was subjected to risks or hazards that a reasonable participant would not expect to encounter in the particular activity.

{¶ 53} Given the prevalence of costumed team mascots at sporting events such as baseball, football, or basketball games, it is perfectly reasonable for a spectator at one of these games to expect to observe those mascots during the normal course of the game. The fact that Harting was allegedly distracted by the Chicken during the bottom of the sixth inning when she was struck by the foul ball did not negate her duty to pay attention to the action taking place on the field. Harting understood the risks associated with being a spectator at a baseball game, and management for the Dragons made numerous announcements designed to warn patrons of the possible dangers inherent in the sport. Thus, no genuine issue exists with respect to Harting's claim, and the trial court did not err when it sustained appellees' motions for summary judgment.

{¶ 54} Harting's sole assignment of error is overruled.

IV

{¶ 55} Harting's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

Judgment affirmed.

FAIN and GRADY, JJ., concur.