130 Nev., Advance Opinion 46

# IN THE SUPREME COURT OF THE STATE OF NEVADA

FCH1, LLC, A NEVADA LIMITED
LIABILITY COMPANY, F/K/A FIESTA
PALMS, LLC, A NEVADA LIMITED
LIABILITY COMPANY D/B/A THE
PALMS CASINO RESORT,
Appellant,
vs.
ENRIQUE RODRIGUEZ, AN
INDIVIDUAL,
Respondent.

No. 59630

**FILED**

JUN 0 5 2014

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY _____
CHIEF DEPUTY CLERK

Appeal from a district court judgment following a bench trial in a tort action. Eighth Judicial District Court, Clark County; Jessie Elizabeth Walsh, Judge.

*Reversed and remanded with instructions.*

Lemons, Grundy & Eisenberg and Robert L. Eisenberg, Reno,
for Appellant.

Hutchison & Steffen, LLC, and Michael K. Wall, Las Vegas,
for Respondent.

BEFORE PICKERING, HARDESTY and CHERRY, JJ.

*OPINION*

By the Court, PICKERING, J.:

At issue is the alleged negligence of Palms Casino Resort in allowing promotional actors to toss souvenirs into a crowd of patrons

14-18254

watching a televised sporting event at the casino's sports bar. Specifically, we must decide whether to extend the limited-duty rule that this court established in *Turner v. Mandalay Sports Entertainment*, 124 Nev. 213, 220-21, 180 P.3d 1172, 1177 (2008), to these facts. We decline to do so, and thus hold there was no error in the district court's refusal to find, as a matter of law, that Palms owed no duty of care. Nonetheless, a new trial is warranted due to evidentiary errors that affected the outcome of the proceeding below.

## I.

Respondent, Enrique Rodriguez, sued the Palms Casino Resort to recover damages for the knee injury he suffered while sitting in its "Sportsbook" bar watching Monday Night Football on television. The injury occurred when another patron dove for a sports souvenir that Brandy Beavers, an actress paid by the Palms to dress as a cheerleader for the Monday Night Football event, had tossed into the group.[1] Rodriguez sued Palms on a theory of negligence.

The matter was tried before the court in a bench trial. Over objection by Palms, the district court permitted several of Rodriguez's treating physicians to testify to the nature and severity of his condition, its causes, and the appropriateness of treatment, both rendered to and recommended for him. It then struck the testimony of Palms' experts on security and crowd control, and economics because they failed to "opine[] that their opinions were given to a reasonable degree of professional

---

[1]Whether or not Beavers and two other women who were also engaged in this souvenir tossing were Palms' employees is unclear and not analyzed or argued on appeal.

 

probability." Ultimately, the district court determined that Palms was liable as a matter of law and awarded Rodriguez $6,051,589 in damages. This appeal followed.

## II.

The parties and the district court assumed that Rodriguez's claim was based on a theory of premises liability, namely that the Palms had increased the risk posed to Rodriguez by not stopping the promotional actors' souvenir-tossing. This is a somewhat unusual application of the doctrine, because alleged negligent conduct and not a condition on the Palms' land caused the injury, perhaps settled upon because the employment status of the women doing the tossing could not be established below. But this court has not limited premises liability to circumstances where a condition on the land caused an injury, *see, e.g., Estate of Smith v. Mahoney's Silver Nugget, Inc.,* 127 Nev. ___, ___, 265 P.3d 688, 692 (2011); *Basile v. Union Plaza Hotel & Casino,* 110 Nev. 1382, 1384, 887 P.2d 273, 275 (1994); *Gott v. Johnson,* 79 Nev. 330, 332, 383 P.2d 363, 364 (1963), and the Restatement sanctions such an application where the landowner has acted to increase the risk posed to entrants. *See* Restatement (Third) of Torts: Phys. & Emot. Harm § 51(a) (2012). In any case, because the district court and both parties analyzed the claim as one based on premises liability, we follow suit.

Generally a premises owner or operator owes entrants a duty to exercise reasonable care, *Foster v. Costco Wholesale Corp.,* 128 Nev. ___, ___, 291 P.3d 150, 152 (2012), but courts may limit that duty. *See* Restatement (Second) of Torts § 496C cmt. d (1965); Restatement (Third) of Torts: Phys. & Emot. Harm § 7(b) (2010); *see also Turner v. Mandalay Sports Entm't, L.L.C.,* 124 Nev. 213, 220-21, 180 P.3d 1172, 1177 (2008).

Typically, courts make such limitations in "the sports setting" as this court had occasion to do in *Turner*. *See Nalwa v. Cedar Fair, L.P.*, 290 P.3d 1158, 1162 (Cal. 2012). Palms analogizes the circumstances surrounding Rodriguez's injury to those in *Turner*, as well as those in similar cases cited in an annotation we relied upon in *Turner*: *Pira v. Sterling Equities, Inc.*, 790 N.Y.S.2d 551, 552 (App. Div. 2005); *Harting v. Dayton Dragons Prof'l Baseball Club, L.L.C.*, 870 N.E.2d 766 (Ohio Ct. App. 2007); *Loughran v. The Phillies*, 888 A.2d 872 (Pa. Super. Ct. 2005).

In *Turner*, a foul ball struck a baseball game attendee in the face while she sat in Cashman Fields' unfenced "Beer Garden." *Turner*, 124 Nev. at 216, 180 P.3d at 1174. We held that the duty the stadium's owners and operators owed an attendee was limited to providing covered seating and otherwise protecting her from "unduly high risk of injury," and that a foul ball did not pose such a risk because it was a "known, obvious, and unavoidable part of all baseball games." *Id.* at 216-19, 180 P.3d at 1174-76. In adopting this rule, this court acted as had many others—there is a well-established and long-standing body of case law similarly limiting the duty owed by baseball stadium owners and operators to game attendees. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 68, at 485 (5th ed. 1984).

The foreign cases relied upon by Palms are part of this body of law. Thus, in *Pira* the plaintiff was struck by a baseball that a player "tossed casually to fans as a souvenir . . . after he completed his pre-game warmup routine." *Pira*, 790 N.Y.S.2d at 551. The New York court granted summary judgment because "the plaintiff failed to raise a triable issue of fact as to whether the defendants unreasonably increased the inherent risks to spectators associated with the game of baseball." *Id.* at 552. In

*Loughran*, the plaintiff was hit by a baseball thrown into the stands by a player after the player had caught it for the last out. *Loughran*, 888 A.2d at 874. The appellate court upheld the trial court's grant of summary judgment because "[c]ountless Pennsylvania court cases [had] held that a spectator at a baseball game assumes the risk of being hit by batted balls, wildly thrown balls, foul balls, and in some cases bats." *Id.* at 876. And in *Harting*, the plaintiff was struck by a foul ball while she was "distracted by the antics" of a costumed mascot chicken. *Harting*, 870 N.E.2d at 770. The Ohio court applied the limited-duty rule because the plaintiff "understood the risks associated with being a spectator at a baseball game, and management for the [baseball team] made numerous announcements designed to warn patrons of the possible dangers inherent in the sport." *Id.* at 770-71.

In sum, though the facts vary slightly among these cases, the question in each was the extent to which a baseball stadium owner or operator has a duty to protect game attendees from errant baseballs and bats, and each holding was limited to the specific facts in issue. *See Turner*, 124 Nev. at 216-19, 180 P.3d at 1174-76; *Pira*, 790 N.Y.S.2d at 551; *Harting*, 870 N.E.2d at 768-69; *Loughran*, 888 A.2d at 877. Thus they do not control the circumstances at hand in any obvious way; Rodriguez's injury occurred while he watched a televised sporting event at a bar, not while he attended a live game at a stadium, and he was hit by a third-party patron diving for promotional gear, not a piece of sporting equipment involved in the game itself.

Courts in other jurisdictions have extended the "primary-assumption-of-the-risk," "limited-duty," or "no duty" doctrine—the names are used interchangeably, *see Turner*, 124 Nev. at 218, 180 P.3d at 1176

Supreme Court
OF
Nevada

(O) 1947A

5

("limited duty"); *Harting*, 870 N.E.2d at 768-69 ("primary assumption of risk"); *Loughran*, 888 A.2d 872 ("no duty")—from these limited circumstances to other recreational activities "involving an inherent risk of injury to voluntary participants . . . where the risk cannot be eliminated without altering the fundamental nature of the activity." *See, e.g., Nalwa,* 290 P.3d at 1163. Palms claims that "tossing souvenirs to audiences at sporting events and other entertainment venues is a very common, well-accepted activity," and suggests that therefore the risk associated with such promotional tossing cannot be eliminated without altering the fundamental nature of the underlying sporting or entertainment event. But, even assuming that this court was willing to extend the *Turner* doctrine to all recreational activities involving an inherent risk of injury, we cannot agree that any risk of injury inheres in the underlying activity Rodriguez engaged in here, namely attending a televised sporting event at a casino sports bar.

"[M]any spectators prefer to sit where their view of the game is unobstructed by fences or protective netting and the proprietor of a ball park has a legitimate interest in catering to these desires." *Benejam v. Detroit Tigers, Inc.,* 635 N.W.2d 219, 222-23 (Mich. Ct. App. 2001) (quotation marks omitted). A stadium owner or operator cannot eliminate the risk errant balls might pose to spectators in such seating without fundamentally altering the game: a batter cannot predict the flight of a ball, so an owner or operator can only remove the risk that a struck ball might fly foul into uncovered seating by prohibiting all batting; and, the hope of retrieving a baseball as a souvenir has "become inextricably intertwined with a fan's baseball experience." *Loughran*, 888 A.2d at 876. The risk involved in riding in bumper cars, the activity to which the

California Supreme Court extended the limited-duty rule in *Nalwa*, is inherent because "[t]he point of the bumper car is to bump." *Nalwa*, 290 P.3d at 1164. And, "[i]mposing liability would have the likely effect of the amusement park either eliminating the ride altogether or altering its character to such a degree . . . that the fun of bumping would be eliminated . . . . Indeed, who would want to ride a *tapper car* at an amusement park?" *Id.* at 1164 (quotation marks omitted).

In *Nalwa*, the California Supreme Court approved a California appellate court's extension of the limited-duty doctrine where a plaintiff was burned when he "tripped and fell into the remnants of the Burning Man effigy while participating in the festival's commemorative ritual." *Id.* at 1163 (citing *Beninati v. Black Rock City, L.L.C.*, 96 Cal. Rptr. 3d 105, 106 (Ct. App. 2009)). In that case the court had noted: "As in previous years, the festival participants had set ablaze a 60-foot combustible sculpture of a man which, because of its gigantic size, was built on an equally large platform made of combustible material and was held upright by wire cables. Once much of the material had burned, and the conflagration had subsided but was still actively burning, Beninati and others walked into the fire." *Beninati*, 96 Cal. Rptr. 3d at 110. Because "[p]ersons who attend Burning Man throw objects into the fire 'so attendees can participate . . . completely with [sic] the Burning Man experience,'" the court determined that the risk of burns associated with the fire was "necessary to the event." *Id.* at 107, 110.

Put simply: the point of attending a live baseball game is to watch athletes bat at and throw baseballs, the point of driving a bumper car is to bump, the point of attending Burning Man is to participate in a "commemorative ritual" involving a giant bonfire; so batting, throwing,

bumping, and bonfires cannot be eliminated from these activities. But the point of watching a televised sporting event at a sports bar is . . . to watch a televised sporting event at a sports bar; having souvenirs tossed in one's direction may or may not enhance the experience depending on one's preference, but as long as the televised event may still be viewed in that venue the activity retains its character. And, if the proprietor of a sports bar declines to hire promotional actors to toss merchandise at attendees, participants can still watch a game with other fans in a sports-themed, alcohol-fueled venue.

So, assuming but not deciding that *Turner* could be extended along *Nalwa*'s lines—and it may be that for certain activities in certain venues the tossing of promotional items is so "inextricably intertwined with [the] . . . experience" that its elimination would alter the fundamental nature of the event in question, *see, e.g., Loughran,* 888 A.2d at 876; though writers elsewhere have suggested that once the injury-causing conduct has strayed too far from the core activity the limited-duty doctrine is inapplicable,[2] *see* Scott B. Kitei, *Is the T-Shirt Cannon "Incidental to the Game" in Professional Athletics?,* 11 Sports Law. J. 37, 56 (2004)— extending it to the circumstances before us here would be a bridge too far. The district court did not err by declining to find that Palms owed no duty as a matter of law.

---

[2]Though, as we note below, even where the connection between the injury-causing conduct and the core activity is attenuated, affirmative defenses may survive.

SUPREME COURT
OF
NEVADA

(O) 1947A

8

## III.

We thus turn to whether Palms breached the duty it owed Rodriguez as a premises owner by failing to take reasonable care. *See* Restatement (Second) of Torts § 341A; Restatement (Third) of Torts § 7 cmts. i & j. Palms called an expert on security and crowd control, Forrest Franklin, who offered an opinion that throwing promotional items into crowds is not uncommon and generally was safe. He described his experience working crowd control and security at events where promoters threw memorabilia, in settings ranging from bicycle races to a conference for "the largest security organization on the planet," and indicated that he knew of no resulting injuries. And he stated that in his years of experience he had "never read anything anywhere that prohibits or inhibits or suggests that, or mandates that it [throwing items into an audience] shouldn't be done." Indeed, according to Franklin the activity was so commonplace that he had "hardly ever heard of anybody not doing it." This testimony suggests that the Palms' conduct was both commonly engaged in and safe, and in turn that the Palms acted reasonably and that Rodriguez's injury was not foreseeable. Given that Rodriguez did not present any expert testimony to the contrary, such evidence could reasonably have shifted the district court's verdict in the Palms' favor.

But, the district court struck Franklin's testimony based on his failure to state that he testified to a "reasonable degree of professional probability." In doing so the district court relied on *Hallmark v. Eldridge*, 124 Nev. 492, 504, 189 P.3d 646, 654 (2008) (holding that evidence was improperly admitted where a medical expert failed to testify to a "reasonable degree of medical certainty"). This reliance was in error. As

SUPREME COURT
OF
NEVADA

(O) 1947A

we have previously indicated, *Hallmark*'s refrain is functional, not talismanic, because the "standard for admissibility varies depending upon the expert opinion's nature and purpose." *Morsicato v. Sav-On Drug Stores, Inc.*, 121 Nev. 153, 157, 111 P.3d 1112, 1115 (2005). Thus, rather than listening for specific words the district court should have considered the purpose of the expert testimony and its certainty in light of its context. *See Williams v. Eighth Judicial Dist. Court*, 127 Nev. ___, ___, 262 P.3d 360, 368 (2011).

Perhaps recognizing this, on appeal Rodriguez attempts to reframe the district court's holding as one finding the Palms' experts' testimony unduly speculative. But Franklin stated that he based his opinion on his years of experience in crowd control and safety and that he had "never read anything anywhere that prohibits or inhibits or suggests that, or mandates that it shouldn't be done." He thus offered a definitive opinion based on research and expertise, not speculation. So, exclusion of his testimony was an abuse of discretion. Inasmuch as it is probable that but for this erroneous ruling a different result might have been reached on the matter of Palms' breach, a new trial is warranted. *Cook v. Sunrise Hosp. & Med. Ctr., L.L.C.*, 124 Nev. 997, 1009, 194 P.3d 1214, 1221 (2008). And because we remand for a new trial on the issue of Palms' negligence, we leave for another day the question of whether Rodriguez engaged in risk assumption so as to implicate any affirmative defense that is available in Nevada.

IV.

In light of our decision to remand for a new trial, we offer additional instruction. First, we conclude that the district court improperly excluded testimony by Dr. Thomas Cargill, an economist who

SUPREME COURT
OF
NEVADA

(O) 1947A

countered Rodriguez's measure of damages based on the "paucity" of information that his expert relied upon as well as his "averaging" of Rodriguez's tax returns. Like Franklin, Cargill did not state that he testified to a reasonable degree of professional probability, but as we held with regard to Franklin, this failure is not dispositive. And, because Dr. Cargill explained that he used his "expertise" to make this calculation and attempted to further instruct the district court as to his methodology (though the district court prohibited him from so doing), his testimony was sufficiently certain given its purpose and context. *Williams*, 127 Nev. at ___, 262 P.3d at 368.

The district court judge also admitted and considered inadmissible testimony by Rodriguez's treating physicians. Rodriguez did not provide a written NRCP 26 expert witness report for any of these physicians. While a treating physician is exempt from the report requirement, this exemption only extends to "opinions [that] were formed during the course of treatment." *Goodman v. Staples the Office Superstore, L.L.C.*, 644 F.3d 817, 826 (9th Cir. 2011); *see Rock Bay, L.L.C. v. Eighth Judicial Dist. Court*, 129 Nev. ___, ___ n.3, 298 P.3d 441, 445 n.3 (2013) (noting that when an NRCP is modeled after its federal counterpart, "cases interpreting the federal rule are strongly persuasive"). Where a treating physician's testimony exceeds that scope, he or she testifies as an expert and is subject to the relevant requirements. *Goodman*, 644 F.3d at 826.

One of Rodriguez's physician-witnesses, Dr. Joseph Schifini, treated Rodriguez for pain associated with his knee injury but testified about: orthopedic surgery (noting that he often could "predict" what a surgeon would do, deeming the orthopedic surgeon's billing rate

reasonable, and finding Rodriguez's surgeon to be well-educated and qualified); neurology and neurological science (predicting the reasonable cost of a "spinal stimulator" and its likely effect on Rodriguez); podiatry (suggesting that Rodriguez's injury caused his ingrown toenail); radiology (assessing what type of X-ray allowed for the most accurate readings); and damages (criticizing a life-care plan as "one of the worst" he had seen in terms of its assessment of damages). Dr. Schifini testified that he formed these opinions during his review of a compendium of Rodriguez's medical records, which consisted of "thousands of pages of documents" from "many, many providers." To the extent that Dr. Schifini reviewed these documents in the course of providing treatment to Rodriguez, he could offer an opinion based on them. *See Goodman*, 644 F.3d at 826; *see also* NRCP 16.1 drafter's note (2012 amendment). But Dr. Schifini did not testify that he had reviewed the documents during the course of his treatment, only that he had "reviewed all the medical records in this case."

In *Ghiorzi v. Whitewater Pools & Spas Inc.*, No. 2:10-cv-01778-JCM-PAL, 2011 WL 5190804 (D. Nev. Oct. 28, 2011) (not reported), the same Dr. Schifini opined, ostensibly as the plaintiff's treating physician, as to the appropriateness and value of treatments that he did not provide to the plaintiff; that all that treatment was "directly related to" the defendants' alleged negligence; that the plaintiff "had tremendous pain and suffering"; and what future treatment the plaintiff might require. *Ghiorzi*, 2011 WL 5190804, at *8. Similar to his assertions before the state district court in this case, Dr. Schifini indicated to the federal district court in *Ghiorzi* that he formed these opinions during his review of the plaintiff's medical records, but elaborated that he undertook that review in order to form "opinions regarding the care, appropriateness of care,

SUPREME COURT
OF
NEVADA

(O) 1947A

12

necessity of care and relatedness of care provided to [the plaintiff]." *Id.* The federal district court limited Dr. Schifini's testimony to "his single examination of the [p]laintiff," the results of MRIs he ordered for the plaintiff, and the necessity and cost of the epidural injection he administered to the plaintiff, because by testifying more broadly Dr. Schifini testified as an expert, not a treating physician. *Id.* at *9. Given the similar breadth in Dr. Schifini's testimony in this case and his vagueness as to the purpose of his review of Rodriguez's medical records, the federal district court's assessment is applicable. *See Schuck v. Signature Flight Support of Nev., Inc.*, 126 Nev. ___, ___ n.2, 245 P.3d 542, 546 n.2 (2010) (this court may rely on unpublished federal district court opinions as persuasive, though nonbinding authority). Allowing Dr. Schifini to testify as he did without an expert witness report and disclosure was an abuse of the district court's discretion.

Moreover, even if Dr. Schifini reviewed records from other providers in the course of his treatment of Rodriguez and *not in order to* form the opinions he proffered, he could only properly testify as to those opinions he formed based on the documents he disclosed to Palms. NRCP 16.1 drafter's note (2012 amendment); *see also Washoe Cnty. Bd. of Sch. Trustees v. Pirhala*, 84 Nev. 1, 5, 435 P.2d 756, 758 (1968) (noting that the purpose of discovery is to take the "surprise out of trials of cases so that all relevant facts and information pertaining to the action may be ascertained in advance of trial"). And of the "thousands of pages" Dr. Schifini apparently read to form the opinions he expressed at trial, he disclosed only 21 pages of records in discovery.

SUPREME COURT
OF
NEVADA

(O) 1947A

13

As to Rodriguez's remaining "treating physician" witnesses, Dr. Walter Kidwell testified for Rodriguez as to "the mechanism" of his injury, and Dr. Maryanne Shannon testified as to whether another doctor's treatment of Rodriguez was "causally related" to his initial injury. Allowing Dr. Kidwell and Dr. Shannon to so testify without requiring them to disclose expert reports was also an abuse of the district court's discretion—once they opined as to the cause of Rodriguez's condition and treatments they testified as experts and should have been subject to the expert witness standards. *Brooks v. Union Pac. R. Co.*, 620 F.3d 896, 900 (8th Cir. 2010).

As the Palms notes, the district court judge in this case has heard the evidence that should have been excluded and formed and expressed an opinion on the ultimate merits. We therefore grant the Palms' request to have this case reassigned if remanded. *See Leven v. Wheatherstone Condo. Corp., Inc.*, 106 Nev. 307, 310, 791 P.2d 450, 451 (1990).

For these reasons, we reverse and remand for reassignment and a new trial consistent with this opinion.

_____, J.
Pickering

We concur:

_____, J.
Hardesty

_____, J.
Cherry