Filed 9/30/20  Plath v. Palo Mar Stables CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SHELLY PLATH,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>PALO MAR STABLES, INC.,<br><br>        Defendant and Respondent. | A159435<br><br>(San Mateo County<br>Super. Ct. No. 17CIV04843) |

Plaintiff Shelly Plath was visiting a friend at defendant Palo Mar Stables (Palo Mar) one evening preparing to help her feed some horses.  Her friend's horse, outside its stall and untethered, was in the barn when Plath entered.  Another person who boarded a horse at Palo Mar drove up and released her dog outside the barn, the barking spooked the loose horse and the horse stepped on Plath's foot and kicked her, causing serious injuries.

Plath sued Palo Mar under a theory of premises liability.  Palo Mar moved for summary judgment, asserting the affirmative defense of primary assumption of risk barred Plath's suit.  Palo Mar established as a matter of law that the defense of primary assumption of risk applies.  As the moving party on summary judgment, Palo Mar also bore the burden to establish that it did not increase the inherent risks of tending to horses in a self-care stable.  We conclude it met its burden to show the risk of being kicked or stepped on

1

by an untethered horse is an inherent part of the risk of tending to horses at a self-care stable and that failure to reduce that risk by monitoring boarders to ensure horses were tethered at all times did not unreasonably increase that risk. However, we conclude that Plath did demonstrate there were triable issues of material fact as to whether Palo Mar effectively allowed unleashed dogs on the property despite its contrary policy and by doing so unreasonably increase the risk beyond that inherent in caring for horses at a self-care stable.

We therefore reverse the trial court's grant of summary judgment and judgment in favor of Palo Mar.

## BACKGROUND

### I.

### *The Complaint*

Plath sued Palo Mar under a theory of premises liability. She also sued the owner of the horse (Robin Howland) and the owner of the dog who spooked the horse (Maria Medeiros) claiming both were negligent, but the claims against them are not at issue in this appeal.

In her complaint, Plath alleged the following facts. Palo Mar's business was the housing and quartering of horses in exchange for a monthly fee or rental. Palo Mar had rules that were visibly posted around the premises, including a rule prohibiting horse owners from allowing their horses to be out of their stalls without being under constant supervision and a rule requiring dogs to be on leash, under control and not loose on the premises. Howland[1] and Medeiros were aware of these rules but violated them, in Howland's case, by allowing her horse, Valentino, to walk around freely outside his stable or

---

[1] The complaint refers to defendant Robin Howland as "Robin Glamma" or "Glamma."

2

corral without supervision, and in Medeiros's case, by allowing her dog, Laika, to run around freely without a leash and out of control.

Plath alleged that defendant Palo Mar was in control of the stable premises and aware that Howland and Medeiros were in the habit of violating the rules, and continued to allow them to do so. As a result, Plath alleged, she was injured on October 25, 2014, when Laika was unleashed on the premises and ran up to Valentino, who was out of her quarters and unsupervised and who, having been thus frightened and spooked, kicked about wildly and injured Plath. Plath's injuries were the result of Palo Mar's "failure to prevent and restrict" Medeiros from allowing Laika to run around freely and failure to restrict Howland from allowing Valentino to leave her quarters and move about the premises unsupervised.

## II.

### *The Proceedings and Summary Judgment*

Palo Mar moved for summary judgment on three grounds: (1) primary assumption of the risk barred Plath's case, (2) Palo Mar did not breach a duty of reasonable care owed to Plath, and (3) there were no unsafe conditions at the stables when the incident occurred.

Palo Mar established the following material facts were undisputed. On the evening of October 25, 2015, Plath came to Palo Mar to visit with Howland and help her feed some of the horses. Howland owned Valentino, a horse she boarded at Palo Mar. When Plath arrived, Valentino was in the barn, walking around untethered. Plath loaded a wheelbarrow with hay and was walking it back to feed horses when she saw Valentino coming toward her in the enclosed barn. Medeiros, who also boarded a horse at Palo Mar, pulled up near the barn in her vehicle and released her dog, Laika. Plath put the wheelbarrow down and focused on Valentino as Laika barked. Valentino

3

stepped on Plath's foot and, as Plath tried to pull away, kicked her, causing her injury.

Palo Mar was a self-care stables, where horse owners were entirely responsible for their horses' care. Palo Mar had a no-dogs policy, and signs were posted on the property so indicating. Palo Mar's owner would sometimes ask that dogs be restrained on the property. Palo Mar's owner had told Howland to keep her horse contained either in the stalls or on a lead rope and halter. Palo Mar's owner, Theodore Vlahos, who walked the property every day, was not aware of Valentino having injured anyone else prior to October 25, 2015, or of any incidents similar to the one in which Plath was injured.

Palo Mar also established as undisputed a number of facts concerning Plath, the materiality of which Plath disputed. These include that Plath had previously lived in an apartment at Palo Mar for about eight months, had significant experience with horses starting when she was very young, was aware that horses can be spooked by dogs and that Laika was rarely kept on leash, was familiar with Valentino and had observed him on prior occasions loose in the stables, and believed Valentino had kicked previous farriers and another boarder.[2]

In opposition to Palo Mar's motion, Plath offered the declaration of Timothy O'Byrne as an expert in horse handling and safety. O'Byrne declared that "Standard Operating Procedures between equine and human

_____

[2] We agree with Plath that her subjective knowledge of the risks associated with horses is not directly pertinent to the analysis of whether the primary assumption of the risk doctrine applies. (See *Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 161.) Palo Mar does not claim otherwise on appeal. Some of these facts are tangentially relevant background information and shall be considered for that limited purpose.

4

interactions" generally call for horses to be tethered or under the control of a person at all times because a "loose horse . . . could easily result in a foreseeable injury to those nearby." O'Byrne also noted that "the restraint of dogs on an equine facility is a common thread of mitigating the risk of injury" because dogs can be "a source of stress to some equines." The declaration concluded that "any astute equine facility manager will be aware of these . . . [Standard Operating Procedures] and regulate the interactions in all areas of the facility." O'Byrne provided no opinions about Palo Mar's operations.

Plath's opposition also asserted additional facts, including that there was no supervisor at Palo Mar to make sure rules were being followed and the stables were being run safely, that Palo Mar was aware that Valentino walked around the stables without a halter or bridle and permitted that, that Palo Mar's owner once told Plath he did not want dogs on the property because he felt they could unsettle the horses, and that the owner told Plath that Medeiros brought her dog to Palo Mar and he was not happy that she did not keep him on a leash.

Plath argued that her subjective knowledge and awareness of potential danger was irrelevant under the primary assumption of risk doctrine and that Palo Mar had a duty under general premises liability principles to "not maintain the premises negligently." She also argued that there were material facts in dispute regarding whether Howland was an employee of Palo Mar rendering it liable under respondeat superior.

The trial court granted Palo Mar's motion for summary judgment and entered judgment on Plath's claim against it.

Plath timely appealed.

5

# DISCUSSION

## I.

### *The Court Erred In Granting Palo Mar's Motion for Summary Judgment.*

#### A. Legal Standards

Appellate courts review a motion for summary judgment de novo. (*Shin v. Ahn* (2007) 42 Cal.4th 482, 499 (*Shin*).) Code of Civil Procedure section 437c, subdivision (c), authorizes courts to grant the motion if "there is no triable issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." The moving party bears the burden of establishing both, and courts review the record in the light most favorable to the non-moving party. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) A defendant moving for summary judgment meets its burden if it demonstrates it has a "complete defense to the cause of action." (Code Civ. Proc., § 473c, subd. (p)(2).) The burden then shifts to plaintiff to show that "a triable issue of one or more material facts exists" as to that defense. (*Ibid*.)

The primary assumption of risk doctrine "embodies a legal conclusion that there is 'no duty' on the part of the defendant to protect the plaintiff from a particular risk." (*Knight v. Jewett* (1992) 3 Cal.4th 296, 308 (*Knight*).)[3] " 'Although persons generally owe a duty of due care not to cause an unreasonable risk of harm to others (Civ. Code, § 1714, subd. (a)), some activities—and, specifically, many sports—are inherently dangerous. Imposing a duty to mitigate those inherent dangers could alter the nature of the activity or inhibit vigorous participation.' [Citation.] The primary assumption of risk doctrine, a rule of limited duty, developed to avoid such a

---

[3] *Knight* was a plurality opinion. However, our high court has since reaffirmed its essential holdings on many occasions. (See, e.g., *Shin, supra,* 42 Cal.4th at p. 491.)

6

chilling effect." (*Nalwa v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148, 1154 (*Nalwa*).)

Application of the primary assumption of risk doctrine does not turn on the reasonableness of the plaintiff's conduct or the plaintiff's subjective intent. (*Knight*, *supra*, 3 Cal. 4th at pp. 308, 313). Rather, it turns on "the nature of the activity . . . and the relationship of the defendant and the plaintiff to that activity." (*Id.* at p. 309.) "The relationship of the parties to each other is also a consideration." (*Hamilton v. Martinelli & Associates* (2003) 110 Cal.App.4th 1012, 1021.)

"With respect to the nature of the activity, the doctrine of primary assumption of the risk applies 'where "*conditions* or *conduct* that otherwise might be viewed as dangerous often are an integral part of the sport [or activity] itself." [Citation.]' [Citation.] 'In these types of activities, the integral conditions of the sport or the inherent risks of careless conduct by others render the possibility of injury obvious, and negate the duty of care usually owed by the defendant for those particular risks of harm. [Citation.] A duty imposed in those situations would significantly change the very purpose or nature of the activity. "The overriding consideration in the application of primary assumption of risk is to avoid imposing a duty which might chill vigorous participation in the implicated activity and thereby alter its fundamental nature." ' " (*Rostai v. Neste Enterprises* (2006) 138 Cal.App.4th 326, 332–333.) "[T]he question of the existence and scope of a defendant's duty of care is a *legal* question which depends on the nature of the sport or activity in question and on the parties' general relationship to the activity, and is an issue to be decided by the court, rather than the jury." (*Knight, supra,* 3 Cal.4th at p. 313.) " 'Duty, being a question of law, is

7

particularly amenable to resolution by summary judgment.' " (*Nalwa*, *supra*, 55 Cal.4th at p. 1154.)

Again, "[t]he primary assumption of risk doctrine rests on a straightforward policy foundation:  the need to avoid chilling vigorous participation in or sponsorship of recreational activities by imposing a tort duty to eliminate or reduce the risks of harm inherent in those activities.  It operates on the premise that imposing such a legal duty 'would work a basic alteration—or cause abandonment' of the activity." (*Nalwa*, *supra*, 55 Cal.4th at p. 1156.)  Our high court has instructed that "[t]he doctrine's parameters should be drawn according to that goal." (*Id.* at p. 1157.)  The "primary assumption of risk doctrine is not limited to activities classified as sports, but applies as well to other recreational activities 'involving an inherent risk of injury to voluntary participants . . . where the risk cannot be eliminated without altering the fundamental nature of the activity.' " (*Id.* at p. 1156.)

"Primary assumption of risk does not provide absolute immunity." (*Griffin v. The Haunted Hotel, Inc.* (2015) 242 Cal.App.4th 490, 499.)  "A participant and an owner/operator still owe certain duties of care.  Such duties vary according to the *role* played by a particular defendant involved in the activity." (*Ibid.*)  Owners and operators of recreational facilities owe a limited duty "not to unreasonably increase the risk of injury over and above that inherent in" the activity.  (*Nalwa*, *supra*, 55 Cal.4th at p. 1152.)  Alternately phrased, "operators, sponsors and instructors in recreational activities posing inherent risks of injury have no duty to eliminate those risks, but do owe participants the duty not to unreasonably increase the risks of injury beyond those inherent in the activity." (*Id.* at p. 1162.)

Courts deny summary judgment when the plaintiff shows an issue of material fact concerning whether the defendant increased the risks beyond those inherent in the activity. (E.g., *Cohen v. Five Brooks Stable* (2008) 159 Cal.App.4th 1476, 1499 [triable issue whether trail guide recklessly increased risk of trail ride by unexpectedly provoking horses to suddenly jump from walk to canter or gallop]; *Shin*, *supra*, 42 Cal.App.4th at p. 500 [questions of fact regarding whether golfer acted so recklessly as to be totally outside range of ordinary activity involved in sport of golfing]; *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1018 [triable issue whether swim coach engaged in conduct totally outside the range of ordinary activity in coaching sport of competitive swimming].)

## B. Palo Mar Established as a Matter of Law that Primary Assumption of Risk Applies.

Primary assumption of risk bars recovery for "injuries from physical recreation, whether in sports or nonsport activities." (*Nalwa*, *supra*, 55 Cal.4th at p. 1157.) In deciding whether to apply the doctrine, courts must determine a defendant's duty, which "depends heavily on the nature of the [activity] itself," and "defendant's role in, or relationship to" the activity. (*Knight*, *supra*, 3 Cal.4th at p. 317.) Palo Mar established, in both the trial court and its respondent's brief, that both factors, as well as the doctrine's policy foundation, support its application here.

### 1. The Nature of the Activity Supports Application of Primary Assumption of Risk.

The facts concerning the activity Plath was engaged in are undisputed. Nonetheless, each party accuses the other of mischaracterizing Plath's activity at the time of injury. Plath argues she was merely "walking in the stables" when Valentino kicked her, while Palo Mar describes her activity as "tending to horses" and beginning to feed them. It is undisputed that Plath

9

was at the stables to help Howland feed horses and that she was inside the barn pushing a wheelbarrow of hay for that purpose when Medeiros let Laika out of her car and she began barking. It was also undisputed that Plath put the wheelbarrow down when Laika began barking but remained in the barn "the whole time."

Plath insists she was not " 'intermingling with horses' " or " 'caring for them' " and that she was "merely walking . . . on her way to feed horses." (Italics omitted.) Plath cannot narrow the court's attention to a single moment to prevent consideration of all the facts shown by the evidence. She went to the stables to help Howland feed horses, she was "helping [Howland] feed and put hey [*sic*] for the horses," she was in the small barn where Howland's horse was untethered and "just walking around," she had been in the barn for about 15 or 20 minutes before the accident occurred, and she had loaded the wheelbarrow with hay for the horses to eat. She was taking the wheelbarrow toward the horses to bring the hay to them when the accident happened. Specifically, she saw headlights, heard a car door slam, saw Medeiros's dog walking toward the barn and barking, saw "the horse was coming my direction," "set the wheelbarrow down" "and the next thing I knew, I got my foot stepped on and got kicked." In short, Plath was engaged in an activity that involved close proximity and physical interaction with horses in a confined space.

Interacting with horses, especially inside a stable or barn, is inherently risky. Many California courts recognize the inherent dangers of horses due to their size and unpredictability. The court in *Shelly v. Stepp* (1998) 62 Cal.App.4th 1288, 1295, concluded that "[i]t is not unusual for a horse to come to a sudden stop, rear up, or sidestep." A spooked horse is so commonplace that courts refuse to impose liability "on purveyors of horse

rides . . . when a horse 'acts' as a horse." (*Harrold v. Rolling J Ranch* (1993) 19 Cal.App.4th 578, 589 (*Rolling J Ranch*); see also *Levinson v. Owens* (2009) 176 Cal.App.4th 1534, 1551.) As the court in *Rolling J. Ranch* observed, the risks associated with horseback riding are many. "A horse can stumble or rear or suddenly break into a gallop, any of which may throw the rider." (*Rolling J Ranch*, at p. 587.) It may "buck, bite, break into a trot, stumble or 'spook' when confronted by a frightening event on the trail such as a shadow or snake or react to peculiar movements of a rider . . . ." (*Id.* at p. 588.) O'Byrne, Plath's expert witness, described similar risks that exist in any interaction with a horse. "[T]he potential risk of injury to humans during interaction with a mature equine is significant, due to . . . an 8-1 weight ratio (1500 lbs v. 190 lbs [*sic*]); relatively high body mass center of gravity; and superior speed/power." Any horse may "at will and without warning, react to a perceived threat or stressor by choosing either the flight or fight response." Because of these inherent dangers, courts have routinely applied the primary assumption of risk doctrine to cases where plaintiffs were injured while horseback riding. (See *Haberlin v. Peninsula Celebration Assn.* (1957) 156 Cal.App.2d 404, 408; *Levinson v. Owens*, *supra*, 176 Cal.App.4th at p. 1551; *Swigart v. Bruno* (2017) 13 Cal.App.5th 529, 537.) And the courts have applied the doctrine in cases involving other animals that pose risks of injury, including dogs, calves and sharks. (E.g., *Priebe v. Nelson* (2006) 39 Cal.4th 1112, 1120–1124 [kennel technician injured by dog bite while walking and caring for dog boarded at kennel]; *Domenghini v. Evans* (1998) 61 Cal.App.4th 118, 122 (*Domenghini*) [rancher injured by calf kicking and headbutting while attempting to restrain him during cattle roundup]; *Nelson v. Hall* (1985) 165 Cal.App.3d 709, 711, 714–715 [veterinary assistant injured by dog while assisting in its treatment]); *Rosenbloom v. Hanour Corp.* (1998)

11

66 Cal.App.4th 1477, 1480–1481 [shark handler bitten while trying to move shark from aquarium].)

Plath attempts to distinguish the cases involving horseback riding, claiming she "was not riding [a horse] at all, she wasn't even touching a horse when she was kicked by [a] freely roaming horse spooked by a loose dog while she was merely walking in a stable." We are not persuaded. We agree with the trial court that "tending to horses roaming freely around a stable" is sufficiently analogous to horseback riding to merit similar treatment because it presents the same or similar inherent risks.

Courts consistently hold that primary assumption of risk encompasses physical activity " 'involving an inherent risk of injury to voluntary participants . . . where the risk cannot be eliminated without altering the fundamental nature of the activity.' " (*Nalwa*, *supra*, 55 Cal.4th at p. 1163, citing *Beninati v. Black Rock City, LLC* (2009) 175 Cal.App.4th 650, 658.) The risk of injury that comes with being near horses, which are unpredictable, prone to spooking, sensitive to noise and far stronger and heavier than humans, cannot be eliminated except by avoiding horses altogether. "Whereas the inherent risks of horseback riding are being bucked or thrown by the horse," the trial court observed, "the inherent risk of tending to horses is being kicked or stomped." Indeed, some of the factors identified by Plath's expert—a horse's weight, speed, power and potential "at will and without warning, [to] react to a perceived threat"—are in play both for those who ride horses and for those on the ground who come into close proximity to horses, particularly where, as here, the person and horse are in a confined space. As the trial court recognized, a horse who, when spooked, suddenly steps on the foot of or kicks a person standing near it in an enclosed space is no less "behaving as a horse" than one that rears up and throws or tramples a

12

rider.  In short, the nature of the activity here supports application of the primary assumption of risk doctrine.

### 2. The Relationship of the Parties to the Activity and the Policy Foundation of Primary Assumption of Risk Support Its Application Here.

Plath argues that applying primary assumption of risk to these facts works an "unwarranted and unjustified expansion of the doctrine of primary assumption of risk."  We disagree.

First, we note that plaintiff was a volunteer.  She was not required to participate in the feeding of the horses but rather chose to do so, perhaps because of her friendship with Howland or simply because she enjoyed engaging with horses.[4]  Moreover, she had no relationship with Palo Mar at the time of the incident, contractual or otherwise.

Second, Palo Mar operated what was described as a "selfcare" stable, at which owners board horses but care for their horses themselves.  Palo Mar did not offer or provide any care to the horses boarded there.  The owner walked the property daily, but there was no supervisor on site to enforce rules and ensure safety.

In regard to plaintiff's relationship to the activity, we find this case analogous to a Second District case applying the primary assumption of risk doctrine to bar the claim of a rancher injured by a calf while participating in a cattle roundup.  (See *Domenghini*, *supra*, 61 Cal.App.4th 118.)  The roundup was an annual event to brand, castrate, dehorn and vaccinate calves, some of which belonged to the plaintiff and some to the defendants.  (*Id*. at p. 120.)  The plaintiff rancher and defendants had in the past worked

_____

[4] It was undisputed that Plath was an experienced equestrian who had owned and ridden horses for much of her life.  She had lived at an apartment on the Palo Mar property for seven or eight months during the year leading up to the incident, though she apparently did not board a horse there.

13

together, undertaking these activities with respect to the calves owned by both. (*Ibid*.) The plaintiff was not employed by the defendants; he and they both ran cattle on the same land. (*Id*. at pp. 120–121.) The court concluded it was " 'classic situation where a defendant's ordinary duty of care is *negated* due to the nature of the activity and the relationship of the defendant to the plaintiff.' " (*Id*. at p. 121.)

The rancher argued the defendants had a duty to employ a safer method of restraining the calves, such as a mechanical chute, rather than using the traditional method in which horsemen rope the calves and others throw them to the ground. (See *Domenghini*, *supra*, 61 Cal.App.4th at pp. 120, 122.) The court disagreed, observing, "The activity at issue here is an old-fashioned cattle roundup using horsemen and ropes, not mechanical chutes. Kicking and headbutting are inherent risks of participation in this activity. Appellant voluntarily agreed to participate in this activity. Whether similar risks are present at cattle roundups using mechanical chutes is beside the point." (*Id*. at p. 122.)

Like the rancher who participated in the roundup in *Domenghini*, Plath voluntarily participated in the activity that led to her injury. She went to Palo Mar, a self-care stables, to help Howland, the owner of a horse boarded there, feed some of the horses. As Plath's own expert observed, "common areas of an equine facility . . . are known to be a hub of activity involving free movement of patrons, their horses as well as approved guests and pets." Further, as her expert also acknowledged, horses are prone to being spooked and acting out in response. They may "at will and without warning, react to a perceived threat or stressor by choosing either the flight or fight response." Being kicked, stepped on, or knocked down by a horse who has been spooked are risks inherent in caring for horses and simply being in close physical

14

proximity to them. Plath voluntarily entered the barn and came into close proximity to the horses at Palo Mar, in particular Valentino, who was untethered and not in his stall. By assisting Howland in feeding the horses, she assumed the obvious risks associated with caring for fully grown equines. She could, in theory, have gone to a full-service stable where the horses would not need to be fed by their owners and where interactions between visitors and horses might have been more closely monitored. But like a cattle roundup using chutes, this would have been a very different activity.

Regarding Palo Mar's relationship to the activity of tending the horses, it is significant that Palo Mar was a self-care stables at which boarders cared for their own horses. Palo Mar boarded horses but did not provide any care. There was no supervisor on site to enforce rules and ensure safety. It was this type of establishment, not a full-board stable with more extensive services, that Plath chose to visit.

Applying the primary assumption of risk doctrine here also aligns with and supports the doctrine's policy foundation. The purpose of primary assumption of risk is to avoid chilling the sponsorship of recreational activities. "[B]y imposing a tort duty to eliminate or reduce the risks of harm inherent in those activities," courts risk fundamentally altering or " 'caus[ing] abandonment' " of the activity. (*Nalwa, supra*, 55 Cal.4th at p. 1156.) The California Supreme Court reasoned that "[a]llowing voluntary participants in an active recreational pursuit to sue other participants or sponsors for failing to eliminate or mitigate the activity's inherent risks would threaten the activity's very existence and nature." (*Id*. at p. 1157.) This policy foundation should determine the "doctrine's parameters." (*Ibid*.)

Although the doctrine originated in the context of sporting activities, courts have since applied it to an array of activities. (*Nalwa, supra*,

15

55 Cal.4th at p. 1156.)  Some activities are obviously recreational, for example, skateboarding (*Calhoon v. Lewis* (2000) 81 Cal.App.4th 108, 115), group motorcycle rides (*Amezcua v. Los Angeles Harley-Davidson, Inc.* (2011) 200 Cal.App.4th 217, 231–232), off-roading (*Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1254), riding an inner tube pulled by a motor boat (*Record v. Reason* (1999) 73 Cal.App.4th 472, 482), participating in a river rafting trip (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 257), and riding in a bumper car at an amusement park (*Nalwa*, at p. 1160).

But the doctrine has been applied outside that context.  For instance, courts have applied primary assumption of risk to takedown maneuvers during a peace officer training class covering arrest and control methods (*Saville v. Sierra College* (2005) 133 Cal.App.4th 857, 863, 866–870); ground fighting maneuvers with a fellow student as part of class for probation officers (*Hamilton v. Martinelli and Associates*, *supra*, 110 Cal.App.4th at pp. 1021–1024); and back country skiing with an instructor while candidates for voluntary ski patrol (*Kane v. National Ski Patrol System, Inc.* (2001) 88 Cal.App.4th 204, 206, 209–214).  And courts have applied the rule to persons engaged in the handling of animals.  (See p. 11, *ante*.)

At minimum, the doctrine applies to any activity that is "done for enjoyment or thrill, requires physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury." (*Record v. Reason*, *supra*, 73 Cal.App.4th at p. 482; see *Beninati v. Black Rock City, LLC*, *supra*, 175 Cal.App.4th at p. 658 [attending Burning Man festival and being burned participating in ritual burning of eponymous effigy]; *Grotheer v. Escape Adventures, Inc.* (2017) 14 Cal.App.5th 1283, 1298 [riding in hot air balloon]: *Griffin v. The Haunted Hotel*, *supra*, 242 Cal.App.4th at p. 500 [participant injured while running away due to fright during Halloween

16

haunted house attraction].) Tending to horses, like caring for dogs or pets of other kinds, is recreational in the sense that it is an activity done by some horse lovers for enjoyment and for others as a labor of love and necessary part of the experience of owning a horse. As Plath testified, she had "been around horses all my life." "One of the things that I enjoy doing is feeding the horses carrots or, you know, putting their food in their pens and helping [Howland]. Valentino was fine with me doing that, and he would let me pet him." Like other recreational activities, caring for horses is "not essential to daily life"; for some, it can be "valuable to one's health and spirit"; and it is "voluntary in a manner employment and daily transportation are not." (*Nalwa*, *supra*, 55 Cal.4th at p. 1157.)

Applying the primary assumption of risk doctrine to the activity of tending horses at a stable would serve the doctrine's purpose of protecting recreational activities, including both interacting with horses and horseback riding, from the chilling effect of liability. To impose liability on proprietors of self-care boarding facilities for injuries caused by horses would tend to increase the costs and drive up the price of boarding with the result that fewer equestrians and horse lovers would be able to afford to own, ride and care for horses. As *Rolling J Ranch*, *supra*, 19 Cal.App.4th at page 588, stated, "to impose some sort of duty on a lessor of horses when a 'horse acts as a horse' is to tell the commercial world that strict liability is imposed for any action of a horse inherent in horseback riding, with the concomitant result that in all probability all commercial horseback riding will cease because of the risk involved to those that are self-insured or by reason of the prohibitive expense to obtain liability insurance for such an enterprise." A similar proposition applies to boarding stables.

For all of these reasons, we conclude that the primary assumption of risk doctrine applies to the activity of tending horses at a self-care stable.

## C. There Is a Triable Issue as to Whether Palo Mar Unreasonably Increased the Inherent Risks of Caring for Horses Stabled at Its Premises.

Having determined that tending horses at a stable qualifies for application of the primary assumption of risk doctrine, and that Palo Mar thus is not subject the general duty of care as to injuries resulting from the risks inherent in that activity, we must still determine whether Palo Mar did anything to increase the risks inherent in that activity.[5] The duty not to increase the risk is a limited one. "Our later decisions establish that under the primary assumption of risk doctrine, operators, sponsors and instructors in recreational activities posing inherent risks of injury have no duty to eliminate those risks, but do owe participants the duty not to unreasonably increase the risks of injury beyond those inherent in the activity." (*Nalwa, supra*, 55 Cal.4th at p. 1162.) The plaintiff in *Nalwa* argued that the operator of a bumper car ride owed her "a duty to take reasonable measures to eliminate or minimize head-on bumping, which she characterize[d] as beyond the inherent risks of a bumper car ride." (*Id.* at p. 1163.) The court disagreed, observing, "While the risks of injury from bumping bumper cars are generally low, a minor injury could occur from bumping at *any* angle. No qualitative distinction exists among the possible angles of collision, and hence no principled basis exists to impose a duty of care uniquely for 180-degree

_____

[5] In the context of primary assumption of risk, the duty not to increase the risks inherent in the activity does not translate into a duty to decrease those risks. (*Avila v. Citrus Community College District* (2006) 38 Cal.4th 148, 166 [while provision of umpires might have reduced risk of pitcher being hit by retaliatory beanball, school district had no duty to reduce that risk].)

18

collisions. And while plaintiff points to defendant's efforts to discourage head-on bumping, such voluntary efforts at minimizing risk do not demonstrate defendant bore a legal duty to do so; not every rule imposed by an organizer or agreed to by participants in a recreational activity reflects a legal duty enforceable in tort." (*Id.* at p. 1163.) The court further rejected the plaintiff's assertion that the defendant's operation of other bumper car rides so as to channel the cars' travel mainly in one direction establish[ed] a duty to operate [the ride on which the plaintiff was injured] in the same manner. The operator of a bumper car ride might violate its "duty to use due care not to increase the risks to a participant over and above those inherent" in the activity [citation] by failing to provide routine safety measures such as seat belts, functioning bumpers and appropriate speed control, but does not do so by failing to restrict the angle of bumping." (*Ibid.*) In short, the court concluded, "[t]he risk of injuries from bumping was inherent in the [defendant's] bumper car ride," an activity that gives its mostly young participants the opportunity to inflict and evade low-speed collisions from a variety of angles." (*Id.*)

From *Nalwa*, we draw two conclusions about the "increasing-the-risk" exception to primary assumption of risk. First, the determination of which risks are inherent in the activity, on which the scope of the duty turns, is a question of law to be decided by the court. (See *id.*; *Knight*, *supra*, 3 Cal.4th at p. 313 ["the question of the existence and scope of a defendant's duty of care is a legal question which depends on the nature of the sport or activity in question and on the parties' general relationship to the activity"]; *Amezcua v. Los Angeles Harley-Davidson, Inc.* (2011) 200 Cal.App.4th 217, 233.) Second, the duty of an operator is a limited one. The relationship of operator of a

facility to a customer does not make "imposition of an ordinary negligence duty appropriate." (*Nalwa, supra,* 44 Cal.4th 1148.)

Palo Mar contends the undisputed evidence shows it "did nothing to increase the risks inherent in plaintiff's activity and her presence on the property." That evidence consisted of the facts that it had a policy of not allowing dogs on the property, the owner had posted signs and asked boarders not to have their dogs on the property, and about 90 percent of the boarders adhered to the policy. It also included evidence that the owner of Palo Mar had told Howland to keep her horse contained either in the stalls or on a lead rope and halter.

Plath contends her expert's declaration opining that "no horse should be allowed to wander freely in an equine facility environment, and dogs must be under control at all times" raised triable issues of fact as to whether Palo Mar increased the risk inherent in the activity of tending to the horses there, "The determinant of duty, 'inherent risk,' is to be decided solely as a question of law and based on the general characteristics of the sport activity and the parties' relationship to it. This determination is necessarily reached from the common knowledge of judges, and not the opinions of experts." (*Staten v. Superior Court* (1996) 45 Cal.App.4th 1628, 1635.) However, Plath also relied on deposition testimony regarding Palo Mar's knowledge that Howland did not consistently tether her horse and Medeiros did not follow the no-dog policy or leash her dog. By pointing to her expert declaration, she implies that Palo Mar should have been required to ensure the boarders kept their horses tethered or in a stable at all times and that loose dogs were not permitted on the property.

As to the first proposition regarding loose horses, we do not agree that Plath raised a triable issue of fact. Self-care stables do not owe a general

20

duty of care to their customers or visitors who interact with the horses. They owe a *narrow* duty not to increase the risks inherent in caring for the horses.

It is well established under the case law cited above that horses are unpredictable and can be spooked by various sounds or sights and react by bolting, bucking, charging, knocking down, stepping on, kicking, biting or otherwise injuring persons standing in their vicinity is an inherent risk of tending to horses in a stable. A horse can be spooked and bite or kick or step on someone whether it, and the person tending it, are inside a stall or outside, and even where a horse is tethered to a post or being led by a rope. If the owner of the stable were required to monitor every movement of the horses within the stable facility at all times, to ensure horses were always in their stalls or tethered, it would change the nature of the activity of caring for one's own horse at a self-care stable into something quite different. The recreational experience at a self-care stable includes caring for one's *own* horse, not having staff hired by the stable monitor the activities of boarders with respect to their horses at all times. Indeed, Palo Mar's contract provided that boarders were responsible for their own horses and for their horses' actions. The fact that the owner of Palo Mar instructed Howland to keep Valentino tethered or in a stall does not translate into a duty on its part to eliminate the risk that she would not always adhere to that directive.

Further, imposing what would amount to strict liability for failure to prevent boarders from violating such a directive would significantly alter the operations of self-care boarding facilities and the activities of horse owners who stable their horses at such facilities. The care provided to the horses by their owners at such stables is a part of the experience of owning a horse. Having staff on site full-time to "orchestrate" and "regulate" every movement within and around the stables would alter the relationship between horses

21

and owners and significantly increase the costs of boarding. Making self-care options less affordable or even unavailable would leave only more costly full-service stables that fewer people could afford. The result would be precisely that which primary assumption of risk is designed to avoid: fewer people would be able to own, care for and ride their own horses. Public policy does not support such a result. (See *Rolling J. Ranch*, *supra*, 19 Cal.App.4th at p. 588.)

As to the issue of dogs, however, we reach a somewhat different conclusion. The presence of dogs would not seem to be inherent in the activity of caring for a horse at a self-care stables or otherwise. Dogs, as Plath's expert opined, can increase the inherent activity of caring for horses at a self-care stables because their presence increases the risk that a horse will be spooked and injure someone. That risk, we conclude, is beyond the risk inherent in simply caring for and being in close proximity with horses. To require that dogs be restrained or prohibit their presence altogether would not necessarily change the character of the activity of caring for horses at a self-care stable.

Plath cited deposition testimony suggestingPalo Mar's owner was aware of unleashed dogs and did not enforce the leash policy. The evidence was decidedly mixed. The owner testified that if he saw a dog on the property loose chasing a cat or chicken or fighting with another dog, he would ask the owner to restrain it or put it back in the car. Boarders and others sometimes brought dogs to the property for a walk and he could not tell every person who drove up and took a dog out for a walk on the property to leash their dog "because there's a lot of area." He also testified that he was aware that Medeiros's dog was not on a leash but the dog did not run around; rather, it followed her either alone or with her horse down to the ocean for a

22

walk. He never saw Medeiros's dog on a leash. He told Medeiros that she needed to keep her dog on a leash and was unhappy that she brought her dog to the stables without keeping it on leash.

Plath testified that Valentino's owner, Howland, kept two Pomeranians at the stables, but the testimony does not indicate whether they were kept on leashes. Another boarder testified that that there were dog walkers who came by the stables and their dogs would sometimes run into the stables, and that when she told the owner about that, he posted no-dog signs. That witness testified she was allowed to bring her dog "as long as I had her with me and tied." In the "beginning," she said, the stable owner allowed Medeiros to bring her dog, "but after a while he said no more dogs . . ."

In short, the testimony about the stable's dog policy and its enforcement was all over the map. There was a dispute of fact as to whether the owner was, in effect, permitting loose dogs on the property or instead making reasonable efforts to ensure they were restrained. That factual dispute presents a triable issue as to whether Palo Mar unreasonably increased the risk beyond that inherent in caring for the horses at a self-care stable.

## II.

### *We Need Not Resolve Plath's Other Arguments.*

Since we reverse the grant of summary judgment on Plath's premises liability claim against Palo Mar, we need not reach her other arguments.

Nor need we address her claim that the trial court abused its discretion in excluding part of her testimony as inadmissible hearsay, albeit for a different reason. The part ruled inadmissible concerned testimony that Palo Mar's owner told her he did not want dogs on the property because they would "unsettle the horses." She claimed this created a dispute with Palo

23

Mar's assertion, based on the deposition testimony of its owner, that the policy's purpose was to avoid dog poop and dog fights on the property. The exclusion of the testimony is inconsequential. The purpose of Palo Mar's no-dog policy has no bearing on an analysis of primary assumption of risk. The material facts are those pertaining to the nature of Plath's activity and the relationship of Palo Mar and Plath to that activity, and whether Palo Mar unreasonably increased the risks inherent in caring for the horses. The intent of Palo Mar's owner in adopting the policy sheds no light on any of these issues.

## DISPOSITION

The judgment in favor of Palo Mar is reversed. The costs of appeal are awarded to appellant.

_____
STEWART, J.

WE CONCUR:


_____
RICHMAN, Acting P. J.


_____
MILLER, J.

_Plath v. Palo Mar Stables, Inc._ (A159435)

25